[Crim. No. 22221. Second Dist., Div. Four. Sept. 12, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
LEE ANTHONY CROSIER, Defendant and Appellant.

**COUNSEL**

Herbert E. Selwyn, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KEENE, J.**\*—Lee Anthony Crosier was charged in a two-count information with the crime of murder (Pen. Code, § 187) and assault with intent to commit murder (Pen. Code, § 217). It was also alleged that the defendant had suffered a prior felony conviction (Health & Saf. Code, § 11530). Dual pleas of not guilty and not guilty by reason of insanity were entered and the truth of the prior, although initially denied, ultimately was admitted.

Approximately five months after arraignment, and before trial, the defendant was found to be "insane" within the meaning of section 1368 Penal Code and unable to stand trial; criminal proceedings were suspended and a commitment to the Atascadero State Hospital ensued. Five months later the defendant was returned to the trial court as "sane," so certified pursuant to section 1372 Penal Code, and specifically so determined by the trial court. Defendant was then tried and convicted by a jury on both counts; the murder was found to be in the first degree.

Subsequent proceedings in the trifurcated trial resulted in verdicts of "sane" at the time of the offenses charged, and death. Motions for a new trial and modification of the verdict of death were denied and the defendant was sentenced to death on count I and to the state prison for the term prescribed by law on count II. An appeal lies and is automatic (Pen. Code, § 1239, subd. (b)).

A long-standing relationship between the defendant and Alberta Johnson, that can best be described as tumultuous, came to a violent end on October 31, 1966, when the defendant shot and killed her with a carbine. Using the same weapon, the defendant within the next hour committed an assault upon the person of Samuel Mullin.

The defendant had a long and extensive psychiatric history. The key question before us is whether the jury was instructed on the pertinent general principles of law relevant to the issues raised by the evidence. (*People v. Graham,* 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153]; *People v. Jackson,* 59 Cal.2d 375 [29 Cal.Rptr. 505, 379 P.2d 937].) Although we conclude that it was not, the error was not prejudicial to the defendant; our examination of the entire record clearly indicates he had a jury determination of each material issue presented by the evidence. (*People v. Sedeno,* 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913].) We, therefore, affirm the judgment of conviction, modifying it first, as we

---

\*Assigned by the Chairman of the Judicial Council.

must, to life imprisonment as to count I. We further order that the sentence of imprisonment to the state prison for the term prescribed by law imposed by count II "be merged and run concurrently with such life term" of count I of the information as it has now been modified. (Pen. Code, § 669.)

There was substantial evidence before the criminal trial court of the defendant's mental condition prior to, on and subsequent to October 31, 1966. His case history is the classic example of the triple "insanity" of the California criminal law. We adopt as most helpful in understanding this trifurcated concept of "insanity" the practice now in existence in the Criminal Division of the Los Angeles Superior Court of labeling the three definitions. See Los Angeles Criminal Trial Judges' Benchbook, page 127. We have and utilize three separate and distinct definitions of "insanity": (1) "present (Pen. Code, § 1368) insanity"; (2) "M'Naughton insanity"; and (3) "post acquittal (Pen. Code, §§ 1026-1026a) insanity." In determining whether a person is "presently sane" within the meaning of section 1368 Penal Code the standard to be applied is: is the defendant capable of understanding the nature and purpose of the proceedings taken against him; does he comprehend his own status and condition in reference to such proceedings; is he capable to assist his attorney in conducting his defense, or able to conduct his own defense in a rational manner? (*People* v. *Pennington,* 66 Cal.2d 508 [58 Cal.Rptr. 374, 426 P.2d 942]; *People* v. *Beivelman,* 70 Cal.2d 60 [73 Cal.Rptr. 521, 447 P.2d 913].) The historical "M'Naughton insanity," as liberalized and used in California upon the plea of not guilty by reason of insanity, is defined as follows: first, did the defendant have sufficient mental capacity to know and understand what he was doing, and, second, did he know and understand that it was wrong and a violation of the rights of another? To be "sane" and thus responsible to the law for the act committed, the defendant must be able to both know and understand the nature and quality of his act and to distinguish between right and wrong at the time of the commission of the offense. (*People* v. *Wolff,* 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959].) The third of California's three legal definitions of "insanity," "post acquittal (Pen. Code, §§ 1026-1026a) insanity," is to be found in *In re Franklin,* 7 Cal.3d 126 [101 Cal.Rptr. 553, 496 P.2d 465], which holds that the relevant standard to be applied is whether the person committed has improved to the extent that he is no longer a danger to the health and safety of others. The procedures in each instance vary and need not be detailed here; however, suffice it to say, Lee Anthony Crosier had prior to trial been through each and, at one time or another, had been adjudged (1) "pres-

ently (Pen. Code, § 1368) insane," (2) "M'Naughton insane," and (3) "post acquittal (Pen. Code, §§ 1026-1026a) insane."

In 1945 the defendant was discharged from the United States Army with a service-connected disability predicated upon a diagnosis of chronic schizophrenic, paranoid type. In 1957 and 1967 the defendant was hospitalized in the Atascadero State Hospital. The first time was as the result of the defendant's conviction for the shotgun slaying of his sister-in-law and then the finding of "M'Naughton insanity" at the time of the commission of that offense and the finding that he had not fully recovered his "sanity" ("post acquittal (Pen. Code, §§ 1026-1026a) insanity"); the second time was in conjunction with this case when he was adjudged to be "presently insane" ("present (Pen. Code, § 1368) insanity") and mentally unable to stand trial. The first confinement was for thirteen months and the second for five when he was released with a diagnosis of schizophrenic reaction, chronic undifferentiated type. Between the two state hospitalizations he was treated intermittently under the auspices of the Veterans' Administration at the Brentwood Hospital. The psychiatrists who examined the defendant were not in accord in their diagnoses and rendered opinions of the defendant's mental condition that ranged from an active psychotic condition at the time of trial, to no more than a sociopathic personality; from "M'Naughton insane" on October 31, 1966, to completely "sane" under the M'Naughton standard. In all, during the three phases of the trial, seven psychiatrists and two psychologists testified on behalf of the defendant and the People on the issue of the mental condition of Lee Anthony Crosier.

Viewing the record in the light most favorable to the People, as the party who prevailed below, and presuming in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence (*People* v. *Reilly,* 3 Cal.3d 421 [90 Cal.Rptr. 417, 475 P.2d 649]) and in the context of the long and extensive psychiatric background of the defendant, we find the following to be the factual situations of the killing and of the assault and of the events leading up to them.

On October 31, 1966, Alberta Johnson drove a friend and co-worker home from work and then drove to her apartment, arriving there some time between 4:30 p.m. and 5 p.m. At about that time, in the parking area of the apartment complex, the defendant and the deceased were observed "tussling" and struggling over what appeared to be a rifle. The deceased was heard to say "I love you, I love you" and "Please don't." This was observed and heard by a next door neighbor, who then became scared and ran, hearing seconds later two shots at about 15-second inter-

vals. Another neighbor heard three shots (four live and four spent .30 caliber castings were later found in the area), went outside and found the deceased. She was in a semi-sitting position with her head resting on top of the porch. Alberta Johnson was killed by a contact or near contact gunshot wound to the head in the area of her left eye. The gun was the defendant's .30 caliber carbine and ballistic testing matched the shell fragments in the deceased's skull with the live and spent castings found near her body.

Samuel Mullin was the next victim of the defendant and he found him in the Tennessee Cafe at approximately 5 p.m. to 5:30 p.m. the same afternoon. After finding Mullin in the cafe, the defendant went back to his car, circled the block, and five minutes later came back armed with his carbine. He exited the vehicle, kicked open the door of the cafe and pointed the carbine at Samuel Mullin. With the proclamation, "I am going to kill you, you son-of-a-bitch," the defendant pulled the trigger. Mullin ran and fortuitously the gun failed to fire, as evidenced by two live bullets that were found on the floor of the cafe. After that the defendant walked to his car with the weapon in his hand and drove away. At approximately 7:30 p.m. that night, the defendant's car was found parked in the middle of the street, the left door was open, and the carbine was inside with a clip in the weapon along with a paper bag containing a second clip and a box of ammunition.

On two occasions that night, the first at about 10 p.m., the defendant called his sister by telephone and in each conversation admitted killing Alberta Johnson. "Gladys, I did it . . . I had to do it because she wouldn't let me stay on the streets . . . she kept me in jail . . ." Another longtime friend of the defendant received a telephone call that night in which the defendant said that he had killed Alberta Johnson. Upon his arrest at about 11:50 p.m. on the night of October 31, 1966, the defendant, upon being informed that he was being arrested for murder, said: "Oh, you mean the person I shot died?"

The volatile relationship of the defendant and Alberta Johnson was of many years duration, during part of which they lived together, and need not be recited here. Suffice it to say, it was marked by numerous heated arguments, multiple arrests, threats and weapon carrying by both Alberta and defendant. Its culmination could almost have been predicted. Several occurrences, however, bear mentioning (one because it involved Samuel Mullin) which occurred approximately one month prior to the date of the killing. Mullin and the deceased were in the Tennessee Cafe when the defendant came in and asked her to go out. When she refused, the defendant grabbed her, hit her, and tore her sweater off. Samuel Mullin

pulled them apart. The cafe owner, "Chester" Parker, ordered the defendant to leave upon threat of calling the police. Five days later the defendant was overheard to say, "Mullin and Chester is dirty. They are dirty and I am going to kill both of them." Two months before the killing, the defendant told Alberta's former husband that he was going to kill Alberta. "She is a dead woman . . . I am crazy, they can't do anything to me." He repeated his threat to the same witness by telephone around the first week of October. Between 1964 and 2 or 3 weeks before Alberta died, the defendant had 20 to 25 conversations with a friend, Wilberforce Smith, in which he repeated his threats to kill Alberta.

On October 30, 1966, the defendant sent a letter to Irene Crosier, his divorced wife, with which he enclosed an insurance policy made out in her son's name. The defendant said in the letter that he was sure he would probably spend the rest of his life in a penitentiary and that he wanted the money to be used for the young man's education. Although the defendant indicated that he was tired of the life that he was living, he was not going to take his own life. She received the letter one day after he took the life of Alberta Johnson and attempted to take the life of Samuel Mullin.

On the two-count information, the jury was instructed on the elements of murder, first and second degree, and assault with intent to commit murder. As lesser and necessarily included offenses of the crime of murder, instructions on manslaughter, voluntary and involuntary (both classes) were given; as a lesser and necessarily included offense of assault with intent to commit murder, the jury was instructed on assault with a deadly weapon and simple assault.[1] The jury was instructed that the crime of assault with a deadly weapon would support a second degree felony-murder conviction.[2] One year later *Ireland* disapproved this concept as "boot-

---

[1]Although assault with a deadly weapon is not a lesser and necessarily included offense of assault with intent to commit murder unless the information expressly alleges that a deadly weapon was used, this instruction was requested by both the People and defendant. (*People* v. *Jennings,* 22 Cal.App.3d 945, 948, fn. 2 [99 Cal.Rptr. 739].) Although the offense of simple assault is technically a lesser and necessarily included offense of the crime of assault with a deadly weapon, if the evidence shows without conflict that the weapon is actually used the jury should not be instructed on it; however, this instruction was requested by both the People and the defendant. (*People* v. *Lovely,* 16 Cal.App.3d 196, 204 [93 Cal.Rptr. 805]; *People* v. *Cooper,* 268 Cal.App.2d 34, 36 [73 Cal.Rptr. 608]; *People* v. *Walker,* 82 Cal.App.2d 196 [185 P.2d 842].)

[2]"Murder of the second degree is the unlawful killing of a human being with malice aforethought which is not perpetrated by means of poison or lying in wait, or by any other kind of wilful, deliberate, and premeditated killing.

"In practical application this means that the unlawful killing of a human being

strapping" without support in either logic or law if the evidence produced by the prosecution, such as in our case, shows the assault with a deadly weapon to be an offense included in fact within the offense charged. (*People* v. *Ireland,* 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

The jury was instructed on diminished capacity (*Wells-Gorshen* rule[3]) and that it could not find the defendant guilty of murder of either degree if it found that his mental capacity was so diminished as to raise a reasonable doubt as to the existence of malice aforethought.[4] Neither side requested and the trial court did not instruct *sua sponte* on "*Conley* manslaughter." (*People* v. *Conley,* 64 Cal.2d 310, 325, fn. 4 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Mosher,* 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659].)

While we sympathize with a criminal trial judge who, either by design or ignorance, is denied effective assistance of trial counsel in properly instructing the jury, the obligation, albeit lonely, is sometimes nonetheless absolute. The ever expanding law of *sua sponte* instructions is now a fertile field, indeed, for defense counsel in obtaining appellate reversal by offering an erroneous instruction or requesting none, objecting to those

---

with malice aforethought is murder of the second degree in any of the following cases:

"(1) When there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish wilfulness, deliberation and premeditation, or

"(2) When the killing results from an act involving a high degree of probability that it will result in death which act is done for a base, antisocial motive and with wanton disregard for human life, or

"(3) When the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life, such as an assault with a deadly weapon."

[3]"When a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent or mental state essential to constitute the crime or degree of crime with which he is charged."

[4]"If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, intoxication or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder. Thus, if you find that the defendant's mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, premeditate, deliberate, or form an intent to kill, you cannot convict him of a wilful, deliberate and premeditated murder of the first degree. Also, if you find that his mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, harbor malice aforethought, as it has been defined for you, you cannot find him guilty of murder of either the first or second degree."

proposed by the People and then arguing the absence or presence of one or more on appeal. The criminal trial judge will not find codified help, for there is no statutory duty imposed on either counsel to "present to the court any written charge on the law." (Pen. Code, § 1127.) He may, however, find some solace in the Supreme Court's recent footnoted warning to defense counsel: "We deem it appropriate to emphasize that the duty of counsel to a criminal defendant includes careful preparation of and request for all instructions which in his judgment are necessary to explain all of the legal theories upon which his defense rests." (*People* v. *Sedeno, supra,* p. 717, fn. 7.) So, with or without assistance from counsel, the judicial duty is still one that requires percipience; however, while it does not require omniscience, the warning flags are up as the proliferation of *suc* *sponte* instructions continues unabated. In the area of diminished capacity, they have been flying for many years.

The law is clear that, even in the absence of a request, the criminal trial judge must instruct on the general principles of law relevant to the issues raised by the evidence. (*People* v. *St. Martin,* 1 Cal.3d 524 [83 Cal.Rptr. 166, 463 P.2d 390]; *People* v. *Castillo,* 70 Cal.2d 264 [74 Cal. Rptr. 385, 449 P.2d 449]; *People* v. *Henderson,* 60 Cal.2d 482 [35 Cal.Rptr. 77, 386 P.2d 677].) As to what the general principles of law. are, this, too, is equally clear; they are those principles which are closely and openly connected with the issues before the court, and which are necessary for the jury's understanding of the case. (*People* v. *St. Martin, supra; People* v. *Wilson,* 66 Cal.2d 749 [59 Cal.Rptr. 156, 427 P.2d 820]; *People* v. *Wade,* 53 Cal.2d 322 [1 Cal.Rptr. 683, 348 P.2d 116].) If a distinction does in fact exist in other areas of the law between the criminal trial judge's obligation as to requested instructions and those to be given *sua sponte,* it surely does not in the area of diminished capacity in a murder case. In this situation, the trial judge, in deciding whether or not to instruct *sua sponte,* cannot fall into the traps of weighing the quantum of evidence or the semantic niceties of such words as "substantial," "supportive," and "deserving of consideration." In *People* v. *Castillo, supra,* the Supreme Court applied the "any evidence" rule of *Carmen* (*People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281]) to the trial judge's *sua sponte* instructional responsibility in a murder-diminished capacity case with the. following language: " 'It is *elementary* that the court should instruct the jury upon every material question upon which there is *any evidence deserving of any consideration whatever.*' "

Throughout the "guilt phase" of the trial there were overtones of sanity, insanity, mental illness and diminished capacity. This is readily discernible,

not only in the extensive expert psychiatric testimony, but it permeates the testimony of lay witnesses as well.

Although three of the psychiatrists who, under court appointment, examined the defendant were of the opinion that he was "M'Naughton Insane" on October 31, 1966 (and each so testified at the "sanity phase") they were not called to testify on the issue of diminished capacity. The one psychiatrist, Dr. George Abe, called by the defendant on this issue was on the witness stand for nine days during the first phase of the trial.[5] He examined the defendant on January 6, 1967, and concluded that the defendant had a schizophrenic mental illness. After reviewing the defendant's voluminous medical records he concluded that the defendant was a "paranoic personality with episodes of psychosis." Dr. Abe testified that in his opinion the defendant did have the requisite mental capacity to formulate malice aforethought and that he had sufficient mental capacity to form the specific intent to kill. In addition to Dr. Abe's testimony, there is evidence suggestive of diminished capacity and the trial court did in fact instruct the jury on its significance in the language we have footnoted above. We must draw the inference that the trial judge thereby concluded that "sufficient" evidence was adduced to compel instructions on diminished capacity, evidence deserving of consideration by the jury; we need but supplement the factual recitation briefly to show that the trial record supports him in this regard.

A police officer for the City of Los Angeles, called on behalf of the People, testified to the arrest of the defendant on August 10, 1966, based upon a complaint by Alberta Johnson that the defendant had threatened her life. The officer related to the jury that Alberta had told him that the defendant had threatened to kill her with a knife and a carbine, that the defendant had been declared criminally insane, that he had been committed to a mental hospital, and that in her opinion the defendant was insane. Ironically, the officer that day took from the defendant's automobile the very carbine that 82 days later would prove to be the death weapon.

---

[5] Although we have been asked to do so, we will not second-guess defense counsel in his decision during the guilt phase to call only one psychiatrist. However, the contention having been made, we searched the record for any indication of ineffective assistance of counsel; our search was in vain. We find no indication that this is either an *Ibarra* or a *Saunders* situation where counsel failed to undertake a careful inquiry and investigation of the defense of diminished capacity, which is legally tantamount to a deprivation of effective legal representation. (*People* v. *Ibarra*, 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487]; *In re Saunders*, 2 Cal.3d 1033 [88 Cal.Rptr. 633, 472 P.2d 921].) Here the diminished capacity concept was known, investigated, and presented as a potential defense.

Virginia Goff was called as a witness for the People and testified to a conversation she had with the defendant on the night of the killing in which he admitted killing Alberta. Further examination of this witness disclosed that she had known the defendant for eleven years, five of which he lived in her home. This witness was employed at the Brentwood Veterans Hospital and worked with mentally ill and mentally disturbed people. She was of the opinion that she would know a mentally disturbed person when she heard one and in her opinion the defendant's voice that she heard on the night of October 31, 1966, sounded mentally disturbed. She also testified to having visited the defendant in the Brentwood Hospital one month prior to the killing in question. The defendant was then a patient at the hospital and the first day that Virginia Goff saw him he appeared "very disturbed" and he did not recognize her.

We are not unmindful of the language in *Conley:* "Although expert testimony with regard to a defendant's inability to achieve a specific state of mind *may* be necessary when the defense of diminished capacity is based upon mental disease or defect . . ." (Italics added.) (*People* v. *Conley, supra,* 64 Cal.2d 310, 325.) We interpret this to mean that each case must be decided on its particular facts and that the "may" of *Conley* does not impose a mandatory method of proof.

It has long been the law, since 1872, that a lay person may give his opinion respecting the "mental sanity" of a person whose sanity is in question providing it is the opinion of an intimate acquaintance (formerly Code Civ. Proc., § 1870, subd. (10)). This old provision of the Code of Civil Procedure was restated in the Evidence Code with its adoption in 1965 as follows: "A witness may state his opinion as to the sanity of a person when: (a) The witness is an intimate acquaintance of the person whose sanity is in question . . ." (Evid. Code, § 870.) "If lay witnesses can give an opinion as to sanity, there is no logical reason why qualified lay witnesses cannot give an opinion as to mental condition less than sanity." (*People* v. *Webb,* 143 Cal.App.2d 402, 412 [300 P.2d 130].) *Webb* sanctioned a qualified lay opinion as to the state of mind short of insanity affecting the formulation of a specific intent. Certainly the quantum will vary, but diminished capacity caused by mental illness or mental defect is a mental condition less than "M'Naughton Insanity" for it would be a legal and logical anomaly to hold that a person who was "insane" under the M'Naughton standard had the mental capacity to formulate the requisite elements of murder. This, we believe, is the rationale of *Wolff,* and of *Wells* and *Gorshen* before it. (*People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492]; *People* v. *Wolff, supra,* 61 Cal.2d 795.)

It, of course, does not necessarily follow, nor do we hold, that a person who in a layman's opinion is "insane," "mentally disturbed," or "very disturbed" is, a fortiori, in such a mental condition that he does not have the capacity to maturely and meaningfully premeditate, deliberate and reflect upon the gravity of his contemplated act, or form an intent to kill, or harbor malice aforethought. Such evidence, however, would certainly be relevant on those issues and the jury in this case was instructed that a finding of "substantially reduced mental capacity . . . caused by mental illness" would have to be considered and depending upon its extent might well negate a finding of guilt on either murder of the first or second degree.

In a murder case, if, in fact, there is in the record evidence of diminished capacity, worthy of consideration by the jury, and the trial judge has made the decision to travel the diminished capacity instructional route, *Conley* mandates that it should be traveled completely; *Conley* further holds that there is no shortcut, there is no detour. This decision was made in this case; unfortunately, after having made it, the trial judge didn't go as far as the Supreme Court says that he should. (*People* v. *Conley, supra.*)

Not only should the jury be told that it cannot convict the defendant of murder without proof of malice, it should also be told that it can convict of voluntary manslaughter if it found that defendant had intentionally taken life, but in so doing lacked malice because of diminished capacity due to mental defect or mental illness, i.e., the "*Conley* manslaughter" instruction. (*People* v. *Castillo, supra.*) The jury should be told of the existence of that type of voluntary manslaughter which differs from murder in that the element of malice has been rebutted by a reduced mental capacity caused by mental illness or mental defect. It is not sufficient to merely define voluntary manslaughter as a homicide provoked by passion or a sudden quarrel. *People* v. *Aubrey,* 253 Cal.App.2d 912 [61 Cal.Rptr. 772], is cited with approval by the Supreme Court, *People* v. *Castillo, supra,* as containing a full and correct explanation of the nature of this error.

The error having been made it is now our duty to evaluate it in the factual context of this case and in light of all the instructions given to the jury. Time was, of recent vintage, when we could not do so. In the time frame delineated by *People* v. *Modesto,* 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33], and *Sedeno* we were bound by strict adherence to the rule that no circumstances could be found justifying an examination of the verdict in light of all the instructions given. Where evidence of diminished capacity existed at the trial tending to negate a specific mental

state, malice aforethought or any other, which is a requisite element of a charged, or included offense, the jury must be clearly and specifically instructed. If not, reversal was mandated as the omission was per se reversible error. We were proscribed from determining whether the factual question presented by the omitted instructions was resolved in another context adversely to the defendant. Reversal does not now necessarily follow; the judicial experience of the 11 years since the opinion was written has led the Supreme Court to the conclusion that strict adherence to such a prohibitive rule as embodied in *Modesto* is no longer necessary. (*People* v. *Sedeno, supra; People* v. *Poddar,* 10 Cal.3d 750 at p. 758, fn. 10 [111 Cal.Rptr. 910, 518 P.2d 342].)

Any doubt that the applicability of *Sedeno* embodies the area of diminished capacity is laid to rest by the language (main and footnoted) of *People* v. *Poddar, supra:* "In short, in any situation where malice aforethought or any other specific mental state must be established in order to find a charged or included offense, evidence of diminished capacity may be used to negate its existence. When such evidence exists the accused is entitled to an instruction which clearly indicates the full effect which a finding of its existence may bear on a crucial mental element of the charged and included offenses. (*People* v. *Mosher* (1969) 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Castillo* (1969) 70 Cal.2d 264 [74 Cal.Rptr. 385, 449 P.2d 449].)[10]"

We turn now to the question of this instructional error: in the factual context of this case, was it cured, and concurrently, was the defendant's right to have jury consideration of all material issues presented by the evidence preserved? We conclude that they were; for in this case, as the Supreme Court found in *Sedeno:* ". . . the jury necessarily rejected defendant's evidence that his diminished capacity negated intent to kill when it found the shooting to be first degree rather than second degree murder . . . ." (*People* v. *Sedeno, supra,* at p. 721.)

It is important to bear in mind that the crucial difference in *Conley* and here is that the *Conley* jury was *never* given an instruction concerning malice aforethought and was *never* told that a finding of malice aforethought was essential to convicting the defendant of murder in either degree. (*People* v. *Conley, supra,* at p. 321.) Therefore, the contention that the *Conley* verdict of guilty of murder in the first degree necessarily meant that the jury had determined that issue adversely to the defendant

---

"[10]The failure to so instruct is no longer per se reversible error. (See *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913].)"

was specious. It was in this instructional void that the *"Conley* instruction" was born. In the case at bench the jury was given proper instructions embodying all rules of law on both degrees of murder.

As we have pointed out above the key psychiatric testimony was given by Dr. Abe, called by the defense, and that in his considered medical judgment the defendant was mentally capable of formulating malice aforethought and the specific intent to kill. By its verdict of guilt of murder in the first degree the jury of necessity agreed with Dr. Abe and found that the defendant not only had the requisite mental capacity, but did in fact intend to kill and did kill wilfully, deliberately and with premeditation and with malice aforethought. They were specifically instructed that they could not make such a finding, by the instruction we have footnoted above, if the defendant's mental capacity was substantially diminished. The jury by its verdict rejected murder in the second degree in light, and in spite of, the same instruction, thereby again finding adversely to defendant on the question of diminished capacity. Even the erroneous *Ireland* condemned instruction did not preclude the jury from finding against the defendant on this issue; for here as in *Sedeno,* "the first degree murder verdict suggests that the jury did not base its decision on the second degree felony murder instruction." *(People* v. *Ireland, supra; People* v. *Sedeno, supra,* at p. 722.) The Supreme Court strongly suggests that it would have affirmed rather than reversed were it not for the additional instruction given in *Sedeno,* which mandated a jury finding of "at least second degree murder," "regardless of diminished capacity," in the event the jury found the death was proximately caused during the commission of the underlying felony.[6] This is not our situation for no such limiting instruction was given on the underlying felony.

We conclude, therefore, that the key issue of diminished capacity, in

---

[6]"This error might not have been prejudicial, since the first degree murder verdict suggests that the jury did not base its decision on the second degree felony murder instruction, had the court not implemented it by also instructing that: 'If you find beyond a reasonable doubt, that Officer Klass' death was proximately caused by the defendant and, further, that the death occurred during the commission of an escape with force or violence, then the killing, regardless of diminished capacity if such existed, must be *at least* second degree murder.' (Italics added.) The clear implication of this instruction was that an initial determination that the killing occurred during an escape made it necessary to find malice and that if it was also determined that the killing was wilful, premeditated, and deliberate, the offense was first degree murder. Since no instructions were given on when the escape might have terminated and we perceive no basis upon which the jury might have avoided the conclusion that the killing took place during an escape, the threshold for the jury's deliberations may well have been that the killing could be no less than second degree murder. If so, the material issue of the existence *vel non* of malice was removed from its consideration." *(People* v. *Sedeno, supra,* at p. 722.)

the circumstances of this case, was determined by the jury under the other properly given instructions. We conclude that the defendant did have a jury determination on every material issue presented by the evidence and that the erroneous failure to instruct fully on the lesser included offense and the erroneous instruction on second degree murder did not constitute a denial of that constitutional right. The defendant could not possibly have been prejudiced by the absence of the *Conley* manslaughter instructions, voluntary or involuntary or by the presence of the erroneous second degree felony-murder instructions.

■ The defendant stands convicted of assault with intent to commit murder as charged in count II of the information. The jury was instructed on the two degrees of murder and, as we have already observed, erroneously that a second degree murder conviction could be predicated upon the felony-murder rule "based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." (*People* v. *Ireland, supra,* 70 Cal.2d 522, 539.) (Italics in original.) "Errors in the instructions relating to the difference between the degrees of murder were not, of course, prejudicial so far as the charge of assault with a deadly weapon with intent to commit murder is concerned, for the law (Pen. Code, § 217) recognizes no such offense as assault with intent to commit murder of the second, as opposed to the first, degree." (*People* v. *Bernard,* 28 Cal.2d 207, 214 [169 P.2d 636].) There is, of course, a substantial difference between the elements of murder in the second degree and assault with intent to commit murder. While malice is an element of each, in the assault crime it is secondary to the factor of specific intent. (*People* v. *Heffington,* 32 Cal.App.3d 1, 16 [107 Cal.Rptr. 859].) The evidence of the defendant's intent to kill Mullins, and of his express malice toward him, is not only clear and decisive, but is indeed overwhelming. It is hard to conceive of a more precise example of specific intent to kill than the defendant's penultimate thought just before he pulled the trigger: "I'm going to kill you, you son-of-a-bitch!" "There was no reasonable probability that excision of the offending language from the instruction on malice ["*People* v. *Ireland* error"] would have resulted in a verdict of acquittal. Rather, if discernible by the jury at all, it might have led to an intermediate verdict finding defendant guilty of a lesser crime." (*People* v. *Heffington, supra,* at pp. 16, 17.)

As we have previously pointed out, although the information did not allege that a deadly weapon was used, the jury was instructed that assault with a deadly weapon and simple assault were lesser included offenses of assault with intent to commit murder. Since both the defendant and

the People requested these instructions, these errors, which we have foot-noted above, are invited and of no appellate moment. Be that as it may, the jury was in fact given two viable alternatives to count II of finding on the lesser offenses in the event that it had a reasonable doubt as to the existence of the requisite and paramount intent to kill. By its verdict of guilty the jury found the specific and crucial state of mind existed. We find the instructional error was not prejudicial to the defendant as the factual questions relating to count II were resolved by the jury, adversely to the defendant, in the context of all the instructions given. (*People* v. *Sedeno, supra.*)

The judgment as to count I provides for the penalty of death and, as such, it must be and is now modified to provide for punishment of life imprisonment (*People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880]); the judgment as to count II provides for the penalty of imprisonment to the state prison for the term prescribed by law and, as such, it must be and is now modified by ordering that it "be merged and run concurrently with such life term" of count I of the information (Pen. Code, § 669); the judgment in all other respects is affirmed.

Files, P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 8, 1974.