STATE OF CONNECTICUT *v.* RUBIN RODRIGUEZ

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and HEALEY, Js.

Argued October 9, 1979—decision released April 29, 1980

*Louis S. Avitabile,* for the appellant (defendant).

*Richard L. Shiffrin,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Domenick Galluzzo,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, Rubin Rodriguez, was indicted by a grand jury for the crime of murder, which charged that on August 28, 1974, with intent to cause the death of Olga Vasquez, he did shoot her and cause her death in violation of General Statutes § 53a-54.[1] Upon a trial to the jury, he was found guilty of the crime of manslaughter in the first degree. The court denied the defendant's motion to set aside the verdict and this appeal followed.

On appeal the defendant claims that the trial court erred: (1) in denying his motion to dismiss the jury panel; (2) in ruling that a child witness,

---

[1] Like the situation presented in *State* v. *Love,* 169 Conn. 596, 598n., 363 A.2d 1035 (1975), although the substantive offense is clearly specified in the indictment and judgment, the statute referred to in the indictment is incorrectly recited as "Section 53a-54" rather than "section 53a-54a," which replaced § 53a-54 and was in effect at the time the homicide was committed. See Public Acts 1973, No. 73-137 §§ 2, 15. The description of the substantive offense in General Statutes § 53a-54 (Rev. to Oct., 1973) is identical to that appearing in General Statutes § 53a-54a. The defendant has made no issue of the incorrect reference, and it is clear from the trial and his appellate brief and argument that he was not misled. "The mistake is at most harmless." *State* v. *Love,* supra.

Jose Serrano, was competent to testify at the trial; (3) in refusing to allow Carmen Colon, Jose Serrano's mother, to testify at the trial concerning her son's character for truth and veracity; (4) in refusing to admit into evidence at the trial the state's answer to a question contained in the defendant's motion for discovery; (5) in refusing to allow the defendant to testify at the trial as to what he said to the victim on the morning of her death; and (6) in denying the defendant's motion to set aside the verdict.

## I

The defendant's motion to dismiss the jury array, the denial of which he has assigned as error, was based upon several grounds. The defendant first argues that General Statutes § 51-217 (Rev. to 1977), which established the qualifications of jurors prior to September, 1977,[2] unconstitutionally encroached upon the judicial power and, hence, violated the doctrine of separation of powers. The defendant attempts to categorize General Statutes § 51-217 (Rev. to 1977) with the statute this court invalidated in *State* v. *Clemente,* 166 Conn. 501, 353 A.2d 723 (1974).

In *Clemente,* we said: " 'It is the province of the legislative department to define rights and prescribe remedies: of the judicial to construe legislative enactments, determine the rights secured thereby, and apply the remedies prescribed.' " *State* v. *Clemente,* supra, 509–10, quoting *Atwood* v. *Buck-*

---

[2] General Statutes § 51-217 (Rev. to 1977) provided as follows: "QUALIFICATIONS OF JURORS. All jurors shall be electors esteemed in their community as persons of good character, approved integrity, sound judgment and fair education, and with no permanent disability impairing their capacity to serve as jurors."

*ingham,* 78 Conn. 423, 428, 62 A. 616 (1905). Statutes relating to the qualification of jurors are part of the machinery created by the legislature to prescribe appropriate remedies for those whose rights have been violated and to protect the rights of those accused of committing a crime. Trial by jury is a long-established and venerated attribute of angloamerican judicial systems. This right is guaranteed in both the state and federal constitutions. See Conn. Const., amend. IV; U. S. Const., amends. VI, VII. General Statutes § 51-217 (Rev. to 1977), which implemented that right, was substantive in nature. It was not inconsistent with the independence of the judicial department; see *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 594, 37 A. 1080 (1897); did not regulate procedure in the Superior Courts; see *State ex rel. Kelman* v. *Schaffer,* 161 Conn. 522, 529, 290 A.2d 327 (1971); and did not infringe upon the Superior Court's traditional exercise of its inherent discretionary power, as did the statute in *Clemente. State* v. *Clemente,* supra, 516. See Kay, "The Rule-Making Authority and Separation of Powers in Connecticut," 8 Conn. L. Rev. 1, 4 (1975).

The defendant has not been able to present us with any authority for the proposition that legislatively prescribed juror qualifications encroach upon the judicial power. Our examination of the law of other jurisdictions discloses that even in those jurisdictions where the rule-making power resides exclusively in the judiciary, the legislature prescribes qualifications for prospective jurors. See, e.g., Colo. Rev. Stat. § 13-71-109; Miss. Code Ann. § 13-5-1; 17 Pa. Cons. Stat. Ann. §§ 1279, 1332 (Purdon). We conclude that the power to regulate reasonably the qualification of persons to serve as jurors in our

courts was properly exercised by the legislative branch of our government by the enactment of § 51-217 (Rev. to 1977).

The defendant also claims that (1) General Statutes § 51-217 (Rev. to 1977), as it read at the time the members of the jury array, from which his petit jury derived, were summoned,[3] is unconstitutionally vague and does not provide sufficient "primary standards" to guide the jury committee members and jury commissioners; see General Statutes § 51-221; and (2) the statute providing for the selection of persons who make up the jury array from electors' lists of each town; see General Statutes § 51-221; deprives the defendant of his right to be tried by a jury drawn from a fair cross section of the community. We considered and rejected identical claims in *State* v. *Brown,* 169 Conn. 692, 696–98, 364 A.2d 186 (1975). See also *Carter* v. *Jury Commission,* 396 U.S. 320, 332–33, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970); *United States* v. *Kelly,* 349 F.2d 720, 778 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S. Ct. 1467, 16 L. Ed. 2d 544 (1966).[4] The defendant has presented us with no reason to depart from our decision in *Brown* and cites no constitutional authority requiring any such departure.

We conclude that the trial court did not err in denying the defendant's motion to dismiss the jury panel.

[3] General Statutes § 51-217 now provides: "QUALIFICATION OF JURORS. All jurors shall be electors who have no permanent disability impairing their capacity to serve as jurors and who have reached the age of eighteen."

[4] In footnote 31 of *Carter* v. *Jury Commission,* 396 U.S. 320, 333, n. 31, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970), § 51-217 is cited as one among many statutes similar to the Alabama statute, which the court ruled constitutionally valid in that case.

## II

The defendant claims that the trial court erred in ruling that the witness Jose Serrano was competent to testify. We agree. Jose Serrano, a deaf mute, was the sole eyewitness of the shooting of Olga Vasquez. His testimony was, therefore, critical in this case. At the time of trial he was ten years old, and at the time of the death of Vasquez, he was nine. Upon Serrano's being offered by the state as a witness, defense counsel asked that the court determine his competency as a witness. At that time the court was informed that Serrano had to testify through interpreters. Two interpreters were qualified and utilized to elicit Serrano's testimony. Prior to the determination of Serrano's competency, the defense offered into evidence his school records from the American School for the Deaf, where he had been a student since 1972. Those records disclosed, among other things, that at the time of trial Serrano had the mental age of a six year old, was in the second grade, was profoundly deaf in that he could not distinguish sounds, such as between singing and a cowbell, could not read, and could only write his own name.

In the absence of the jury, the court held a hearing through the interpreters to determine whether Serrano was qualified to testify. Serrano stated his name and age and that he attended and liked school. Upon being asked if he knew what it was to tell the truth, the answer given by the interpreter was: "He nodded through expression on his face, yes." He was asked: "Will you promise to tell the truth and not a lie?" to which the interpreter responded: "He nodded his head, yes." He was also asked:

"If you promise to tell the truth, and you tell a lie, do you understand you can be punished?" He answered "Yes." He also answered yes to the question, "Do you understand that it is your duty to tell the whole truth in this case?" The court then stated: "Ask him what happens if he doesn't tell the truth." The interpreter, after communicating with the witness, said: "From what I interpreted, it [his response] means that he won't tell a lie when he knows that he has to be honest." Thereupon, the court asked: "Does he understand that he has to tell the truth in this Court?" The interpreter then said to Serrano: "You know it is important that you have to tell the truth. And you will really tell the truth; you have to tell — everything you say has to be honest?" The witness answered: "Yes."

Defense counsel asked if he knew what it meant to be afraid and the interpreter said: "He said noise." Upon being asked what "noise" was, the answer was: "A gun makes noise. When woman died, when she was shot. Gun." Upon being asked if he could hear noise in his ears he said: "A little bit."

After additional inquiry by the court and counsel, the trial court concluded: "Jose Serrano understands the oath of the witness and, therefore, is competent to testify." Defense counsel excepted to the ruling. On appeal, the defendant claims that the trial court erred in declaring Serrano competent to testify because Serrano could not receive correct sense impressions, did not understand the obligation of an oath, and had no intelligent comprehension of the facts sought to be developed.

The testimonial capacity of a child witness is a matter for the court to determine upon inquiry.

*State* v. *Segerberg,* 131 Conn. 546, 547, 41 A.2d 101 (1945). In Connecticut, the examination to determine the competency of a witness is usually conducted by counsel under direction of the court, except insofar as the court may find it advisable to intervene. See *State* v. *Orlando,* 115 Conn. 672, 676, 163 A. 256 (1932). Because the competency of a witness is a matter peculiarly within the discretion of the trial court, its ruling will be disturbed only in a clear case of abuse or of some error in law. *State* v. *Siberon,* 166 Conn. 455, 457, 352 A.2d 285 (1974); *State* v. *Orlando,* supra, 675; *Kuczon* v. *Tomkievicz,* 100 Conn. 560, 572–73, 124 A. 226 (1924).

In determining the competency of child witnesses, age is not the decisive factor. See *Kuczon* v. *Tomkievicz,* supra, 570; McCormick, Evidence (2d Ed.) § 62. Instead, the trial court must consider "the proposed witness' maturity to receive correct impressions by his senses, ability to recollect and narrate intelligently, and ability to appreciate the moral duty to tell the truth." *State* v. *Siberon,* supra, 458. The witness should also have an intelligent comprehension of the facts sought to be developed. See *State* v. *Segerberg,* supra, 548; *Kuczon* v. *Tomkievicz,* supra, 570; McCormick, loc. cit.

The defendant points out that Serrano's ability to receive correct sense impressions was impaired by his profound deafness. While it is true that the accuracy of the witness' visual sense impressions was more significant in this case, it is clear from the testimony elicited that Serrano's audio impressions were also important. Serrano's testimony was inconsistent at times on the number of shots fired. Thus, Serrano's inability to receive correct audio

sense impressions had an impact upon the testimony he gave at the trial and upon the ultimate question of his competency as a witness.

The defendant also argues that the trial court erred in concluding that Serrano understood the obligation of an oath. The defendant suggests that because Serrano did not know the exact nature of the punishment for not telling the truth, i.e., the punishment for perjury, he could not fully understand the oath of a witness. He relies in this claim upon language of the trial court set out in *Kuczon* v. *Tomkievicz,* supra, 569. While it is true that every witness, no matter what his age, must understand the obligation of the oath he takes before testifying in a court of this state, this requirement is satisfied when a child witness "appreciate[s] the moral duty to tell the truth." See *Kuczon* v. *Tomkievicz,* supra, 573; *State* v. *Siberon,* supra, 458. This duty is the core of a witness' oath. Whether a child witness is aware of the potential punishment for perjury is not. We cannot say that the court was required to declare Serrano incompetent to testify on this ground.

We agree with the defendant's claim that the state did not demonstrate at the preliminary hearing to determine competency that Serrano had an intelligent comprehension of the facts sought to be developed or that he could recollect and narrate those facts intelligently. See *State* v. *Segerberg,* supra, 548. At this hearing to determine competency, no inquiry at all was made into Serrano's comprehension of the facts about which he was to testify. What this court said in *State* v. *Segerberg,* supra, 548, bears repeating here: "Under the most liberal tests, the obligation of the oath and an intel-

ligent comprehension of the facts sought to be developed remain a necessary part of the qualifications of a competent witness."

Our inquiry does not end here, however, for error must be harmful before it will provide the basis for a reversal of a criminal conviction. *State* v. *Runkles,* 174 Conn. 405, 413, 389 A.2d 730, cert. denied, 439 U.S. 859, 99 S. Ct. 177, 58 L. Ed. 2d 168 (1978); *State* v. *Annunziato,* 169 Conn. 517, 524, 363 A.2d 1011 (1975); Maltbie, Conn. App. Proc. §§ 17, 20. In order to demonstrate to this court that the error committed by the trial court was harmful, it was incumbent upon the defendant to include in his brief[5] those portions of the transcript of Serrano's testimony that evidence Serrano's actual inability to comprehend intelligently the facts sought to be developed or to recollect and narrate intelligently those facts. This was not done. Such an examination of the testimony given is necessary, for even though a proper foundation had not been laid establishing competency at the preliminary hearing, had the testimony later given satisfied the applicable test, any error in the preliminary ruling would not be considered harmful. We would be inclined to overlook this deficiency; see Practice Book, 1978, §§ 3060R, 3164; were it not for the fact that the trial court committed harmful error with respect to another claim raised by the defendant.

### III

The defendant asserts that the trial court committed reversible error in its ruling preventing the defendant from allowing Serrano's mother, Carmen Colon, to impeach the credibility of Serrano. The

---

[5] See Practice Book, 1978, § 3054 (c) (3) (Rev. to June, 1979) now § 3060F (c) (3) and § 3060R.

defendant made a lengthy offer of proof in which he demonstrated that Serrano's mother knew her son's character for truth and veracity both personally and in the community in which Serrano lived.[6] Defense counsel then asked Carmen Colon whether she was acquainted with Serrano's character, to which she responded yes. Counsel then asked: "Is his character for truth and veracity equal to that of mankind in general," to which the witness responded no.[7] The trial court concluded that these questions could not be asked under Connecticut law and ruled that the testimony of Carmen Colon on this issue was inadmissible. Although the state argued before the trial court that the only permissible inquiry of a character witness is his knowledge of an individual's reputation for truth and veracity in the community, the state now concedes in its brief that error was committed by the court's refusal to allow any of the witness' testimony relative to Serrano's trait of veracity. The state argues, nonetheless, that such error was harmless.

In *State* v. *Blake,* 157 Conn. 99, 104–105, 249 A.2d 232 (1968), and *State* v. *Gelinas,* 160 Conn. 366, 368–69, 279 A.2d 552 (1971), this court finally settled the persistent confusion over the proper method of eliciting evidence of character. See also *State* v. *Martin,* 170 Conn. 161, 163, 365 A.2d 104 (1976). Both cases presented the question whether the only method for eliciting character evidence was to inquire of the character witness' knowledge of the

---

[6] An examination of the offer of proof reveals that the testimony of Carmen Colon could have had a substantial adverse impact on the credibility of the witness Jose Serrano. Practice Book, 1978, § 3060R.

[7] These questions derive from *State* v. *Randolph,* 24 Conn. 362, 367 (1856). We need not examine such far removed precedent to determine the propriety of the court's ruling here.

defendant's or another witness' reputation in the community for the trait in issue. In both cases this court concluded that character evidence could be elicited either by inquiry into the character witness' knowledge of the individual's general reputation in the community for a particular trait or "by the opinion evidence of those who have been shown to have had an opportunity to form, and who have formed, an opinion as to the character of the . . . [individual] with respect to the trait or traits in issue." *State* v. *Blake,* supra, 104–105; *State* v. *Gelinas,* supra, 368; see *Richmond* v. *Norwich,* 96 Conn. 582, 593–97, 115 A. 111 (1921). This rule has been adopted by the federal courts; see Fed. R. Evid. 608 (a); and by the drafters of the Model Code of Evidence in §§ 306 (2) (a) and 401.[8] The testimonial foundation laid by the defendant in the lengthy offer of proof justified utilizing either of these methods in establishing the witness' character for truth and veracity. The court's refusal to allow the defendant to elicit such testimony of the witness was, therefore, error.

We do not agree with the state's contention that the court's error was harmless. See, e.g., *People* v. *Rowland,* 262 Cal. App. 2d 790, 798, 69 Cal. Rptr. 269 (1968). The defendant's right to impeach the credibility of the state's sole eyewitness to the crime is substantial. It implicates the defendant's constitutional right to confront the witnesses who testify against him. See U.S. Const., amend. VI; Conn. Const., art. 1 § 8. "In simple language, the defendant has the right to explore every facet of

[8] For an excellent discussion of the origin of the so-called "English Rule" that character could be proved exclusively by reputation see 7 Wigmore, Evidence (Chadbourn Rev. 1978) §§ 1981, 1982, 1985. See also McCormick, Evidence (2d Ed.) § 44.

relevant evidence pertaining to the credibility of those who testify against him." *United States* v. *Partin,* 493 F.2d 750, 763 (5th Cir. 1974), cert. denied, 434 U.S. 903, 98 S. Ct. 298, 54 L. Ed. 2d 189 (1977). In *State* v. *Gelinas,* supra, we ruled that the court's erroneous exclusion of evidence offered by the defendant bearing on the truth and veracity of the two child complainants could not be harmless because the veracity of these witnesses was crucial to the state's case. We stated: "Under the circumstances where a determination of the guilt or innocence of the defendant depended in large measure on the veracity of the children testifying against him it cannot be said that the ruling was harmless error." *State* v. *Gelinas,* supra, 369. Likewise, under the circumstances of this case, we cannot say that the testimony of the mother of the sole eyewitness to the homicide impugning her son's character for truth and veracity "could not reasonably have affected the verdict." *State* v. *Moynahan,* 164 Conn. 560, 602, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973); *State* v. *Tropiano,* 158 Conn. 412, 427, 262 A.2d 147, cert. denied, 398 U.S. 949, 90 S. Ct. 1866, 26 L. Ed. 2d 288 (1969). We must conclude that the error was harmful.

Although our conclusion on this issue is dispositive of the appeal, we will consider certain of the defendant's claims which may have an impact on the new trial we order below.

## IV

The defendant assigns error to the trial court's refusal to allow into evidence the state's answer to a question asked in his motion for discovery. The defendant filed a motion, pursuant to Practice

Book, 1963, § 2152 (1) (now Practice Book, 1978, § 741 [1]), seeking disclosure of exculpatory information or material, which the court granted. The state's answer was: "None contained in the State's file other than [that] a neighbor stated that the victim may have owned a pistol." During the trial the defendant offered into evidence this question and answer and the state objected. During the argument on the offer of this evidence it was disclosed that the statement was made by Jose Rivera who lived on the second floor above the apartment where the body of Olga Vasquez was found. The state objected to the offer on the grounds that the answer to the motion was not an admission and that it was not credible evidence. The defendant excepted to the sustaining of the state's objection.

The defendant argues that the statement is admissible because: (1) the state is a party to the action, and hence, its answer to an interrogatory has the same effect as a judicial admission made in a pleading or in open court; and (2) even if the statement is not a judicial admission of the state, it is a hearsay statement made by an unavailable declarant, which, on the basis of *Chambers* v. *Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), would be fundamentally unfair to the defendant to exclude.

The defendant's first argument, that the answer is admissible as a judicial admission, is based upon the authority of two civil cases. *Bochicchio* v. *Petrocelli,* 126 Conn. 336, 339–40, 11 A.2d 356 (1940) (action to recover on two promissory notes); *Hirsch* v. *Thrall,* 148 Conn. 202, 207, 169 A.2d 271 (1961) (action to recover damages for personal injuries). These cases stand for the proposition that, in a civil

action, "[a]n answer filed by a party to an interrogatory has the same effect as a judicial admission made in a pleading or in open court"; *Bochicchio* v. *Petrocelli,* supra, 339; and that "[a] party is bound by a judicial admission unless the court, in the exercise of a reasonable discretion, allows the admission to be withdrawn, explained or modified." *Hirsch* v. *Thrall,* supra, 206–207. The defendant has provided us with no reason to extend this rule to criminal actions, and we can conceive of none. Moreover, this "statement" concedes no fact in issue in this case. The state by its answer does not concede that the victim owned a pistol or that a pistol owned by the victim inflicted the fatal wound. Professor Wigmore has written that a judicial admission is "[a]n express waiver, made in court or preparatory to trial, by the party or his attorney, conceding for the purposes of the trial the truth of some alleged fact, has the effect of a confessory pleading, in that the fact is thereafter to be taken for granted; so that the one party need offer no evidence to prove it, and the other is not allowed to disprove it. . . . It is, in truth, a substitute for evidence, in that it does away with the need for evidence." 9 Wigmore, Evidence (3d Ed.) § 2588. He goes on to indicate that "[t]he vital feature of a judicial admission is universally conceded to be its *conclusiveness* upon the party making it, i.e. the prohibition of any further dispute of the fact by him, and any use of evidence to disprove or contradict it." (Emphasis in text.) 9 Wigmore, op. cit., § 2590.

An answer to a motion to disclose exculpatory information in a criminal case, unlike the answer to a discovery motion in a civil case, serves only to satisfy the constitutional requirement that the

state disclose material which raises a reasonable doubt of the defendant's guilt that would not otherwise exist. *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) ; *State* v. *Grasso,* 172 Conn. 298, 301–303, 374 A.2d 239 (1977). This requirement exists independent of any motion by the defense for disclosure. *State* v. *Grasso,* supra, 302. A defendant is thus enabled to investigate the material disclosed to determine whether it leads to evidence that raises a reasonable doubt of his guilt that he may seek to introduce at his trial. The answers to such interrogatories are not in themselves competent evidence of the guilt or innocence of the accused, much less judicial admissions of the state. Moreover, in a criminal prosecution, the state is unlike a party to a civil action with respect to judicial admissions. This is so because the state is not an actor in the transaction or event giving rise to the prosecution as is a party to a civil action, but only exercises the public's power to vindicate its criminal laws.

The defendant's contention that the answer to the interrogatory is admissible hearsay under the rule of *Chambers* v. *Mississippi,* supra, requires little discussion. The defendant reasons that the "statement" that was made out of court is admissible because Jose Rivera, the neighbor who evidently was interviewed by police following the death of Olga Vasquez, was unavailable. The short answer to this assertion is that the declarant of the "statement" in issue was not Jose Rivera, but the individual responding to the discovery motion on behalf of the state. We would be faced with an entirely different situation had the defendant offered into evidence a written statement of Jose Rivera. Under the circumstances of this case, the

trial court's refusal to admit this "statement" into evidence was not error. The United States Supreme Court's decision in *Chambers* v. *Mississippi, supra,* does not require a different conclusion.

## V

The defendant's claim that the court erred in refusing to allow him to testify concerning what he said to the victim a short time before her death also may be briefly addressed. The statements were excluded on the ground that they were hearsay. The defendant did not offer these statements to prove the truth of the matter asserted therein; see *Gyro Brass Mfg. Corporation* v. *United Automobile Workers,* 147 Conn. 76, 80, 157 A.2d 241 (1959); McCormick, Evidence (2d Ed.) § 246; but only to establish a "time frame" for the events of the morning on which the victim died. Under this claim of admissibility, however, the content of the conversations was not relevant. On appeal the defendant claims for the first time that these statements were offered to show the defendant's state of mind. We do not address this claim inasmuch as we order a new trial at which the defendant will have an opportunity to pursue this theory of admissibility.

## VI

We discuss now the defendant's claim that the trial court erred in refusing to set aside the verdict to the extent that the arguments the defendant makes on this ground have an impact on our disposition and a new trial. As we said in *State* v. *Troynack,* 174 Conn. 89, 99, 384 A.2d 326 (1977), where a defendant is convicted of a lesser offense than that charged, that conviction is an implicit

acquittal on the greater offense.[9] See *Price* v. *Georgia*, 398 U.S. 323, 329, 90 S. Ct. 1757, 26 L. Ed. 2d 300 (1970). Therefore, we do not remand this case for a retrial on the indictment of murder.

The defendant based his motion to set aside the verdict on the ground that there was no foundation either in the law or the evidence at trial to support the verdict of guilty of manslaughter in the first degree. In this regard, he claims that General Statutes § 53a-45 (c) is, in this case, in conflict with the right of a criminal defendant to be informed of the nature and cause of the accusation against him under the federal and state constitutions. See U.S. Const., amend. VI; Conn. Const., art. I § 8. He reasons that because he was charged with murder, a crime requiring the element of specific intent to cause the death of another, the court's charge on manslaughter in the first and second degrees and criminally negligent homicide, which do not require the same state of mind, violated his right to be informed of the crime he is alleged to have committed.[10]

General Statutes § 53a-45 (c) provides: "The court or jury before which any person indicted for

---

[9] In *State* v. *Troynack*, 174 Conn. 89, 99, 384 A.2d 326 (1977), the jury were instructed to consider the defendant's guilt of the lesser offense only after deciding that the defendant was not guilty of the greater. The jury in this case were likewise instructed to consider the lesser crimes only if they concluded that the state had not proved murder beyond a reasonable doubt.

[10] Although the defendant concedes that he failed to take an exception to the charge in this regard, it is evident that if he has been convicted of an offense for which he was never given notice, as he suggests, then he has been deprived of a fundamental constitutional right and a fair trial. Therefore, we consider this claim although it is raised for the first time on appeal. See Practice Book, 1978, § 3063; *State* v. *Rice*, 172 Conn. 94, 101, 374 A.2d 128 (1976); *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973).

murder is tried may find him guilty of homicide in a lesser degree than that charged." As the defendant points out, the same provision as that contained in General Statutes § 53a-45 (c) was in effect prior to the enactment of the Penal Code in 1969. General Statutes § 53-9 (Rev. to 1958).[11] The former statutory scheme applicable to homicides recognized four categories of homicide: Murder in the first and second degrees; General Statutes § 53-9 (Rev. to 1958); manslaughter; General Statutes § 53-13 (Rev. to 1958); and misconduct of railroad employees or motor vehicle operators that causes death. General Statutes § 53-17 (Rev. to 1958).

The language of § 53-9 that appears in the present § 53a-45 (c) has been held to permit four possible verdicts under an indictment for first degree murder: guilty of murder in the first degree, guilty of murder in the second degree, guilty of manslaughter, and not guilty.[12] See *McBrien* v. *Warden,* 153 Conn. 320, 329, 216 A.2d 432 (1966); *State* v. *Tomassi,* 137 Conn. 113, 122, 75 A.2d 67 (1950). In *McBrien* v. *Warden,* supra, 326, this court said: "On a trial on an indictment for murder, it was felt desirable, as far back as 1830, to make sure that

---

[11] General Statutes § 53-9 (Rev. to 1958) provides in pertinent part: "[T]he jury before which any person indicted for murder is tried may find him guilty of homicide in a less degree than that charged." In our analysis, we do not consider the word "degree" in § 53-9 (Rev. to 1958) or § 53a-45 (c) critical as we treat that term as applying to the grade of homicide in each of the applicable statutory schemes.

[12] We have no need in this discussion to refer to a verdict of not guilty by reason of insanity.

In no case decided under the former homicide statutes have we discovered a charge given in which the jury were permitted to find a defendant indicted with murder guilty of General Statutes § 53-17 (Rev. to 1958). We assume that in none would the facts have warranted such an instruction.

the petit jury, in accordance with the common-law rule, could return a verdict of guilty of manslaughter if the proof warranted even though only murder would have been charged in the indictment." Although the 1958 revision did not contain a definition of manslaughter, its common-law definition was applied by the courts. That definition focused on the presence of malice in murder and its absence in manslaughter. See *State* v. *Johnson*, 139 Conn. 89, 91–96, 90 A.2d 905 (1952). Thus, under the homicide statutes in effect prior to 1969, a person indicted for murder could be found guilty of a "wilful, deliberate and premeditated killing," or a killing perpetrated in the course of committing certain enumerated crimes (murder in the first degree, § 53-9); "homicide committed with malice aforethought" (murder in the second degree, § 53-9); see, e.g., *State* v. *Shelton*, 160 Conn. 360, 363, 278 A.2d 782 (1971); homicide without malice aforethought (manslaughter, § 53-13); *State* v. *Johnson*, supra, 91–92; or, where applicable, homicide committed under circumstances set forth in § 53-17 (Rev. to 1958) (wilful misconduct or gross negligence). In the category of manslaughter under § 53-13 was included the intentional infliction of a wound from which death ensued; *State* v. *Tomassi*, supra, 119; *State* v. *Bantley*, 44 Conn. 537, 540 (1877); and engaging in an activity in a "reckless manner or with wanton disregard for the safety of others" which causes death. *State* v. *DiLorenzo*, 138 Conn. 281, 286, 83 A.2d 479 (1951). As these categories disclose, the state of mind of the actor varied according to the degree or grade of homicide involved. Such gradations of the mental state went along the single spectrum of criminal culpability in our former statutory scheme of homicide. It is

therefore difficult to understand how the defendant can argue that the statutory language permitting a jury to find a defendant indicted for murder guilty of homicide in a lesser degree than that charged was constitutionally permissible prior to the enactment of the Penal Code in 1969, but not subsequent to that time. In both statutory schemes, the state of mind required for a homicide of a lesser degree than that charged is different from the state of mind for the offense charged.

In *State* v. *Tomassi*, supra, we construed substantially the same language as that appearing in § 53a-45 (c)[13] and concluded that "the natural meaning of the . . . provision is that on the theory that the greater offense includes the less, . . . the jury may determine the case under the original charge by finding the accused guilty of the lesser offense where such a conviction is warranted and is the only one warranted upon the evidence." *State* v. *Tomassi*, supra, 122–23. It is a well-settled principle of constitutional law that where one or more offenses are lesser than and included within the one charged, notice of the one charged constitutes notice of any lesser included offenses. See *Paterno* v. *Lyons*, 334 U.S. 314, 320–21, 68 S. Ct. 1044, 92 L. Ed. 1409 (1948); *Walker* v. *United States*, 418 F.2d 1116, 1119 (D.C. Cir. 1969); *State* v. *Conklin*, 115 N.H. 331, 335, 341 A.2d 770 (1975); *State* v. *Daniels*, 223 Kan. 266, 271, 573 P.2d 607 (1977); Barnett, "The Lesser-Included Offense Doctrine: A Present Day Analysis for Practitioners," 5 Conn. L. Rev. 255 (1972). Therefore, for purposes of this defendant's sixth amendment right to notice, the

[13] The provision actually construed in *State* v. *Tomassi*, 137 Conn. 113, 75 A.2d 67 (1950), was part of General Statutes § 8350 (Rev. to 1949).

question presented to us is whether the two sections of the first degree manslaughter statute; General Statutes § 53a-55 (a) (1) and (3);[14] the second degree manslaughter statute; General Statutes § 53a-56 (a) (1);[15] and criminally negligent homicide; General Statutes § 53a-58;[16] are, in this case, lesser included offenses of murder and proper subjects of a jury instruction under the authority of § 53a-45 (c). Because each of these homicide statutes requires a different state of mind of the actor than that required for murder,[17] the question is whether one homicide offense can be lesser than and included within another such offense where the state of mind required for the greater is more culpable than the state of mind required for the lesser.

---

[14] General Statutes § 53a-55 (a) (1) and (3) provide: "MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; . . . or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[15] The relevant portion of General Statutes § 53a-56 provides: "MANSLAUGHTER IN THE SECOND DEGREE: CLASS C FELONY. (a) A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . .

(b) Manslaughter in the second degree is a class C felony."

[16] General Statutes § 53a-58 provides: "CRIMINALLY NEGLIGENT HOMICIDE: CLASS A MISDEMEANOR. (a) A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person, except where the defendant caused such death by a motor vehicle.

(b) Criminally negligent homicide is a class A misdemeanor."

[17] The states of mind involved are defined in General Statutes § 53a-3 (11), (13) and (14) with the exception of manslaughter in the first degree under subsection (a) (3) of § 53a-55, which requires recklessness and "circumstances evincing an extreme indifference to human life." This last phrase indirectly bears upon the defendant's state of mind. See *Commonwealth* v. *Pierce*, 138 Mass. 165, 175 (1884) (Holmes, J.); *People* v. *France*, 57 App. Div. 2d 432, 394 N.Y.S. 2d 891 (1977).

The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. This is especially true where a person has caused the death of another person. The death of a person may be caused by a purely accidental act or omission of another, from which no criminal liability may result, or it may come about as the result of long and careful planning, for which the law prescribes severe penalties. Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proved by circumstantial evidence; *State v. Moynahan,* 164 Conn. 560, 579–80, 325 A.2d 199 (1973); and is, except in rare cases, a question of fact. See *Stevenson v. United States,* 162 U.S. 313, 314, 16 S. Ct. 839, 40 L. Ed. 980 (1896); *State v. Vars,* 154 Conn. 255, 263, 224 A.2d 744 (1966); cf. *State v. Cianflone,* 98 Conn. 454, 463, 120 A. 347 (1923).

Where the state is faced with a homicide prosecution, it may, in good faith and where the circumstances reasonably warrant, assume that an accused acted with the most culpable state of mind. But where the evidence is reasonably susceptible of another conclusion, the jury, or three judge panel, as the case may be; see General Statutes § 53a-45(b); should not be bound by that assumption and forced by its verdict to choose only between the offense with the most culpable state of mind and acquittal. Such a result would limit the jury's function of determining questions of fact and undermine a defendant's right to a trial by jury. See *Keeble v. United States,* 412 U.S. 205, 212–13, 93 S. Ct. 1993, 36 L. Ed. 2d 844 (1973); *Sanchez v. People,* 172 Colo.

168, 173–74, 470 P.2d 857 (1970). This reasoning was adopted by the United States Supreme Court in *Stevenson* v. *United States,* 162 U.S. 313, 16 S. Ct. 839, 40 L. Ed. 980 (1896). Reviewing a trial court's refusal in a murder prosecution to instruct the jury on manslaughter, the court there said: "The evidence as to manslaughter need not be uncontradicted or in any way conclusive upon the question; so long as there is some evidence upon the subject, the proper weight to be given it is for the jury to determine. If there were any evidence which tended to show such a state of facts as might bring the crime within the grade of manslaughter, it then became a proper question for the jury to say whether the evidence were true and whether it showed that the crime was manslaughter instead of murder." Id., 314.

Permitting the jury to find the defendant guilty of a lesser charge of homicide than that charged, where the evidence supports such a finding, does not violate the defendant's sixth amendment right to notice. By the charge on the greater offense of murder, the defendant is put on notice that he will be put on trial for his action in causing the death of another person. Thus, having been given notice of the most serious degree of culpable intent by the murder indictment, he is implicitly given notice of those lesser included homicides that require a less serious degree of culpable intent. See *Walker* v. *United States,* 418 F.2d 1116, 1119 (D.C. Cir. 1969); *Mildwoff* v. *Cunningham,* 432 F. Sup. 814, 817 (S.D. N.Y. 1977); *State* v. *Conklin,* 115 N.H. 331, 335, 341 A.2d 770 (1975).

In reaching this conclusion we have examined a great deal of case law from other jurisdictions.

In none have we discovered, nor has counsel referred us to, a holding that prevents a court from instructing a jury in a homicide case on a lesser degree of homicide than that charged where the evidence so warrants. Rather, courts consistently hold that where the evidence supports an instruction on a lesser degree of homicide than that charged, it is error to refuse to give such an instruction. *Stevenson* v. *United States,* 162 U.S. 313, 314–15, 320–23, 16 S. Ct. 839, 40 L. Ed. 980 (1896); *DeMarrias* v. *United States,* 487 F.2d 19, 21 (8th Cir. 1973), cert. denied, 415 U.S. 980, 94 S. Ct. 1570, 39 L. Ed. 2d 877 (1974); *Government of Virgin Islands* v. *Carmona,* 422 F.2d 95, 100 (3d Cir. 1970); *Gardner* v. *Forister,* 468 F. Sup. 761 (W.D. N.C. 1979); *Chavers* v. *State,* 361 So. 2d 1106 (Ala. 1978); *Gieffels* v. *State,* 590 P.2d 55, 64 (Alaska 1979); *State* v. *Jones,* 109 Ariz. 80, 81, 505 P.2d 251 (1973); *People* v. *Crosier,* 41 Cal. App. 3d 712, 724–25, 116 Cal. Rptr. 467 (1974), cert. denied, 421 U.S. 966, 95 S. Ct. 1956, 44 L. Ed. 2d 453 (1975); *Sanchez* v. *People,* 172 Colo. 168, 173, 470 P.2d 857 (1970); *People* v. *Simpson,* 74 Ill. 2d 497, 500, 384 N.E.2d 373 (1978); *State* v. *Booker,* 200 Kan. 166, 170, 434 P.2d 891 (1967), cert. denied, 391 U.S. 965, 88 S. Ct. 2031, 20 L. Ed. 2d 879 (1968); *Bartrug* v. *Commonwealth,* 568 S.W.2d 925, 926–27 (Ky. 1978); *State* v. *Schluter,* 281 N.W.2d 174, 176 (Minn. 1979); *State* v. *Anderson,* 515 S.W.2d 534, 537 (Mo. 1974); *State* v. *Thomas,* 147 Mont. 325, 331, 413 P.2d 315 (1966); *State* v. *Fuller,* 203 Neb. 233, 243, 278 N.W.2d 756 (1979); *State* v. *Manus,* 93 N.M. 95, 99, 597 P.2d 280 (1979); *People* v. *Strong,* 37 N.Y.2d 568, 569–72, 338 N.E.2d 602 (1975); *Commonwealth* v. *Thomas,* 393 A.2d 1122, 1124, 1127–30 (Pa. 1978) (Pomeroy, J.). We note also that the same result we reach

would obtain under the lesser included offense provision of the Model Penal Code. See Model Penal Code § 1.07 (4) (c).

The defendant relies primarily upon this court's decisions in *State* v. *Troynack,* 174 Conn. 89, 95–99, 384 A.2d 326 (1977), and *State* v. *Ruiz,* 171 Conn. 264, 269–72, 368 A.2d 222 (1976), for his argument that the lesser crimes involved here would not have been lesser included offenses of murder. We point out that *Ruiz* did not involve a prosecution for homicide and that in *Troynack,* which did, the court was not presented with any claim involving General Statutes § 53a-45 (c). To the extent that the reasoning employed in those cases is contrary to the analysis we employ here, however, they are no longer controlling.

By our decision today we do not suggest that an instruction on a lesser degree of homicide than that charged will always be the proper subject of a lesser included offense instruction. The conditions we set out in *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980), control. For purposes of the second condition of *Whistnant,* we conclude, however, that an offense that would be a lesser included offense but for its requirement of a less culpable state of mind than that required for the greater, will be deemed a lesser included offense. Therefore, there must be "some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense [of homicide]; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater

offense but guilty of the lesser." Ibid. Where these conditions are met, an instruction on a homicide of a lesser degree than that charged is appropriate, whether requested by the state or the defendant, or given by the court sua sponte.

In the light of this conclusion, we examine the offenses upon which the jury were instructed, to determine which of them is a proper subject of a lesser included offense instruction and, therefore, an appropriate charge against the defendant for the purpose of the second trial. Under the conditions set out above, which require that there be some evidence to justify conviction of the lesser offense, it is apparent that the evidence at the first trial as summarized in the briefs could not have justified a jury instruction upon criminally negligent homicide; General Statutes §§ 53a-58; manslaughter in the second degree as defined in General Statutes § 53a-56 (a) (1), or manslaughter in the first degree as defined in General Statutes § 53a-55 (a) (3). The evidence, as summarized in the briefs, could not have supported a conclusion that the defendant, in causing the death of the victim, acted with criminal negligence; see General Statutes § 53a-3 (14); or with recklessness; see General Statutes § 53a-3 (13); or with recklessness under circumstances evincing an extreme indifference to human life. See General Statutes § 53a-55 (a) (3). The evidence summarized in the briefs is reasonably susceptible of a conclusion that the defendant, intending to cause serious physical injury to the victim, caused her death. See General Statutes § 53a-55 (a) (1).[18]

---

[18] By our decision we do not preclude the trial court from instructing the jury at the second trial upon any lesser included offense to which the state or the defendant may be found entitled.

There is error, the judgment is set aside and the case is remanded for a new trial on the charge of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1).

In this opinion the other judges concurred.