[No. A016419. First Dist., Div. Three. Dec. 20, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
OTIS DUCKETT, Defendant and Appellant.

1116

COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Jean R. Sternberg, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ronald E. Niver and John H. Sugiyama, Deputy Attorneys General, for Plaintiff and Respondent.

---

## OPINION

**WHITE, P. J.**—Appellant Otis Duckett was convicted by a jury of first degree murder; the jury also found that he was sane when he committed the offense. He contends: (1) the jury's finding of sanity is unsupported by substantial evidence; (2) the prosecutor committed prejudicial misconduct during the sanity phase of the trial; and (3) the trial court erred when it refused to instruct with CALJIC Nos. 3.35 and 8.78 during the guilt phase of his trial. For the reasons set forth below, we reverse and remand the judgment finding appellant sane but, in all other respects, affirm.

### I

In 1974, after he shot at some people at Laney College, appellant was found to be insane and committed to a state mental hospital. He was released from confinement in October 1979. Shortly thereafter, he talked to his friend Rasida Page about Vincent Herron and Herron's mother, Faye Joiner. He told Page that he believed Herron was a snake and the devil's son; he believed Joiner was a witch who was practicing voodoo on him. He told Page he planned to kill Herron and his mother.

On November 2, 1979, appellant and his wife went to a pawn shop where he bought a .12 gauge shotgun, which he took to a rifle range and fired a few times. He thought about shooting Joiner because she "would not let [him] live." About 10 p.m., he drove to her house and waited for her. She arrived about 11 or midnight. He parked in front of her car and called out to her. When he asked her if she was going to leave him alone, she said, "hell, no, fuck you." He shot her, got into his car, and left.

At the guilt phase of his trial, appellant's defense was diminished capacity. Psychiatrist Karen Gudiksen testified that in her opinion, on the date of the shooting, although appellant had the ability to form the intent to kill, he was unable to premeditate, deliberate, or form malice aforethought. She had interviewed appellant once in conjunction with his 1974 offense, and three times after the Joiner killing. She also reviewed physicians' reports evaluating him over several years, and listened to tapes of his admissions to police officers and a district attorney. According to Dr. Gudiksen, appellant suffered from chronic paranoid schizophrenia and experienced auditory "command hallucinations"; she believed he was in an acute phase of

his illness at the time of the killing. During one interview, for example, appellant told Dr. Gudiksen that he heard voices telling him that Joiner was going to kill him or have him killed.

Psychiatrist Charles Morris testified in rebuttal. He had interviewed appellant six times between 1974 and the trial. He agreed that appellant suffered from paranoid schizophrenia of a chronic, long-standing nature. Nevertheless, he concluded that in addition to being able to form the intent to kill, appellant could premeditate, deliberate, and form malice aforethought, because at the time of the offense he was in "pretty good remission."

At the sanity phase, Dr. Gudiksen testified that in her opinion, at the time of the offense, as a result of his schizophrenia, appellant could neither substantially appreciate the criminality of his conduct nor conform his conduct to the requirements of the law. Psychiatrist Frederick Boyse testified similarly, as did Dr. Morris, despite his contrary testimony at the guilt phase. The jury found that appellant was sane when he killed Joiner.

## II

Jurors are not automatically required to render a verdict which conforms to unanimous expert opinion as to a defendant's sanity. Our Supreme Court has frequently upheld on appeal verdicts finding a defendant sane in the face of contrary unanimous opinion. (See *People* v. *Drew* (1978) 22 Cal.3d 333 at p. 350 [149 Cal.Rptr. 275, 583 P.2d 1318] and cases cited therein.) A defendant has the burden of proof on the issue of sanity; if neither party presents credible evidence on that issue, the jury must find him sane. "Thus the question on appeal is not so much the substantiality of the evidence favoring the jury's finding as whether *the evidence contrary to that finding is of such weight and character that the jury could not reasonably reject it.*" (*Id.*, at pp. 350-351, italics added.)

The value of an expert's testimony with respect to sanity rests on the material from which his opinion is fashioned and the reasoning by which he reaches his conclusion. (*People* v. *Drew, supra,* 22 Cal.3d at p. 350.) A jury may reasonably reject psychiatric testimony on the ground that the psychiatrists did not present sufficient material and reasoning to justify their opinions. (*Id.*, at p. 351.) In *Drew*, for example, the jury found defendant sane under the old M'Naghten rule despite unanimous expert testimony to the contrary. Concluding that the record supported the jury's finding, the court explained that nothing in the psychiatrists' testimony explained their reasoning. Although the psychiatric testimony described the defendant's repeated aggressive acts and diagnosed his condition as latent schizophrenia,

neither psychiatrist explained *why* that behavior and diagnosis led to the conclusion that the defendant was unable to appreciate the wrongfulness of his acts. (*Id.*, at pp. 350-351.) Similarly, in *People* v. *Coogler* (1969) 71 Cal.2d 153 [77 Cal.Rptr. 790, 454 P.2d 686], the court held that a jury could properly have rejected uncontradicted expert testimony as to a defendant's diminished capacity. The court explained that the jury may reasonably have had doubts about the material upon which the expert's conclusions were based, material which the court described as the defendant's own "self-serving descriptions of his alleged past blackouts and lack of memory of the acts in question." (*Id.*, at pp. 166-168.)

However, in *People* v. *Samuel* (1981) 29 Cal.3d 489 [174 Cal.Rptr. 684, 629 P.2d 485] the court held that a jury could not reasonably have rejected "persuasive and virtually uncontradicted" evidence proving defendant's incompetence to stand trial, and set aside the jury's finding of competence. (*Id.*, at p. 506.)

### III

■ Similarly, here the evidence of appellant's insanity was of such weight and character that a jury could not reasonably reject it. By stipulation, all of the evidence at the guilt phase could be considered by the jury at the sanity phase. Rasida Page, appellant's friend of some 16 or 17 years and grade school classmate, described appellant's behavior "normal" in 1973 when they jointly enlisted for two years' active duty in the United States Navy. Both enlistments, Page testified, were terminated early in 1974: Page's because of a "reading" problem, appellant's because of "conduct." Three months after the discharge, Page testified to a noticeable change in appellant's behavior, i.e., he would stare silently for five to ten minutes at a time, then relate that during such times he was "seeing demons and that nameless people were trying to harm him." When Page visited appellant at Napa, appellant was obsessed with the Herron/Joiner family and Mrs. Joiner as a "witch" who had "put voodoo on him." After appellant's release in October 1979, appellant asked Page to purchase a shotgun for him so he could kill Mrs. Joiner and her son.

Ollie Mae Johnson, appellant's mother, also testified to a markedly noticeable change in behavior, i.e., from a son that never sassed her to one that "clashed" inexplicably at her when she intervened to prevent his physical assaults upon his younger sisters. Mrs. Johnson described appellant's condition generally as being "mental." Specifically, she described him as "talking to himself" and "grinning to himself" and when "asked what he was laughing at . . . he said, '[n]othing.'" Appellant's mother characteristically knew something was amiss with her son's mental condition but "I

didn't know what it was." She considered "dope," but only because she had heard people in church "talking about children changing and how they carried on with dope." She armed herself with a gun out of fear for her own safety and that of appellant's sister.

The jury also had before it appellant's long history of chronic paranoid schizophrenia. Dr. Morris agreed with Dr. Gudiksen's diagnosis that appellant's illness was characterized by disordered thoughts, delusions, hallucinations, inappropriate effect and bizarre behavior. Appellant's paranoia focused on women, and in particular, Mrs. Joiner and her family. A delusion about Mrs. Joiner and her family was the basis of the 1974 shooting incident at Laney Community College (Laney) which occurred within three months of his discharge from the Navy. Appellant, while enrolled as a student at Laney, shot and wounded two students on campus. Three days later, elsewhere, he shot and wounded a 70-year-old man in the hand. Appellant was of course arrested, charged and detained in custody for these offenses. While detained and before disposition, appellant rationalized to his mother his motivation for his bizarre and irrational life-threatening, violently assaultive conduct. "He told me that a man and woman was telling him to shoot these people, that they was at him to kill him." After a court found him insane, the 1974 incidents led to appellant's five-year commitment to Atascadero and Napa State Hospitals.

The homicide of Faye Joiner was not appellant's first show of violence, nor his last. The record indicates that he was first arrested on November 19, 1979, and charged with another shooting incident at the Joiner residence. Appellant was neither connected to, nor charged with, the instant homicide until January 1980.

At the guilt phase, Dr. Morris disagreed with Dr. Gudiksen only as to the effect of appellant's illness. Dr. Gudiksen opined that appellant's illness caused him to obey a command hallucination to shoot Mrs. Joiner. She stated that appellant genuinely believed that Mrs. Joiner was a witch and that he had to kill her to avoid being killed first. Dr. Gudiksen, therefore, concluded that appellant was incapable of harboring the necessary premeditation, deliberation and malice aforethought.

Dr. Morris, however, testified that while appellant's fixed delusions might prevent him from forming malice aforethought, they did not do so as to the November 2, 1979, shooting of Joiner. Dr. Morris' conclusion that appellant on that date was capable of forming the necessary mental states to commit murder was predicated on Dr. Morris' view that appellant was "in pretty good remission" at that time. Morris based his view of appellant's remission on: (1) the fact that appellant obtained the gun around noon on November

2, did not shoot Mrs. Joiner the first two times he saw her but waited for her on the porch at night, and then sold the weapon afterwards; and (2) Morris' "recollection" that appellant had been taking Stelazine before his October 1979 release from Napa. Appellant told Morris he stopped taking the drug before his release. Morris based his guilt phase opinion on the "carry-over" effect of Stelazine "of about three months."

At the sanity phase, however, Dr. Morris testified that appellant lacked the capacity to appreciate the criminality of his conduct and lacked capacity to conform his conduct to the requirements of the law. Dr. Morris did not explain the contradiction between this conclusion and his earlier testimony at the guilt phase. The record indicates that Dr. Morris explained only that some of his earlier opinions were based on different standards such as appellant's competency to stand trial. (Pen. Code, § 1368.) Dr. Morris also admitted that appellant's remission was "brittle." Dr. Morris' testimony at the sanity phase (as at the guilt phase) was based on his August 1981 examination of the appellant, the hospital records and appellant's statements.

Dr. Steven Donoviel, a clinical psychologist and director of clinical treatment who participated in the treatment of appellant at Napa State Hospital, testified that appellant could not function in society, unless he was heavily and continually medicated with Prolixin (a drug more potent than Stelazine) administered by injection. While at the state hospital, appellant was experimentally taken off medication on two occasions. Within two weeks he developed a delusional system as to a woman who was "making him evil," like that which preceded the 1974 offenses. Accordingly, the staff concluded that injections of Prolixin at two or three week intervals would control his psychotic thinking and would allow closer supervision of him as an outpatient. Prolixin is a longer acting drug and was preferred because patients like the appellant could not be trusted to take oral medications like Stelazine. Although between 1974-1979 the staff recommended appellant's release on conditions including Prolixin injections, appellant was never released because of flareups of his illness. In August 1979, Napa asked for an extension of appellant's civil term. Apparently, before the proper commitment extension procedures were initiated, appellant was released in October 1979 because the maximum term of commitment for his 1974 offense had expired.

At the sanity phase, Dr. Gudiksen explained that even at optimum levels of Stelazine, appellant might still hear voices. The therapeutic effect of the medicine dropped off very quickly once the treatment regimen was discontinued. If he did not continue to take his medication, there would be rapid signs of deterioration. Appellant's mother testified that after his release in October 1979, appellant stopped taking his medication, because appellant and his wife thought Stelazine would destroy his brain or harm him. On his

weekend passes from Napa, appellant seemed better whenever he took his medicine; on the weekends when he stopped his medication, he was disturbed and violent. His weekend passes were revoked following fights and outbursts of dangerous behavior at Napa. Appellant did not bring any medicine home when he was released. When Dr. Gudiksen asked the appellant whether he had taken his medication on November 3, 1979, he gave inconsistent answers.

Thus there was no credible evidence to support Dr. Morris' opinion at the guilt phase that at the time of the Joiner homicide appellant was in remission because of the carry-over effect of the drugs.

Dr. Frederick Boyse, a third psychiatrist who testified at the sanity hearing, agreed with Drs. Gudiksen and Morris that appellant was a paranoid schizophrenic. As to individuals like Mrs. Joiner who were associated with his delusional system, Dr. Boyse opined that appellant could not appreciate that his conduct was criminal and could not conform his conduct to the requirement of the law. Appellant could be lucid and rational in aspects of his life that were not part of his paranoid delusions and as to these could conform his conduct to many requirements of the law. He could not do so as to Mrs. Joiner because his mental defect led him to believe the killing was necessary.

The substance of the report of the prosecution's psychiatrist who interviewed appellant and concluded that he was insane was also admitted. The record of the sanity phase demonstrates that the jury here failed to give great weight to the unanimous expert opinion that appellant was insane. Dr. Morris' unexplained reversal of his prior opinion was undoubtedly confusing and another demonstration of the difficulties of the frequently criticized bifurcated proceedings. (See *People* v. *Cruz* (1980) 26 Cal.3d 233, 252 [165 Cal.Rptr. 1, 605 P.2d 830].) Here there were no circumstances present that would have permitted the jury to reject the expert opinion. (Cf. *People* v. *Drew, supra,* 22 Cal.3d 350; *People* v. *Coogler, supra,* 71 Cal.2d 153, 166-168; *People* v. *Bassett* (1968) 69 Cal.2d 122, 137, 141-143 [70 Cal.Rptr. 193, 443 P.2d 777].) Accordingly we reverse the verdict finding appellant legally sane.

Even if we viewed the evidence at the sanity hearing as merely in conflict, we would reverse the sanity verdict on an additional and independent ground.

■ The law of this state does not require a *sua sponte* instruction that an insanity verdict would result in a hospital commitment.[1] ■ During

---

[1]Some jurisdictions require such an instruction. (See *People* v. *Smith* (1973) 33 Cal.App.3d 51 [108 Cal.Rptr. 698], disapproved on another point in *People* v. *Wetmore* (1978) 22 Cal.3d 318, 324, fn. 5 [149 Cal.Rptr. 265, 583 P.2d 1308].)

the closing argument the prosecution misstated the law and conveyed an inflammatory appeal to the jury to avoid exposing society to future danger.[2] A line of authority supports the reversal of a sanity verdict where such an argument is made, even in the absence of an objection. (See *People* v. *Smith, supra,* 33 Cal.App.3d 51, fn. 8 at p. 71.) Contrary to the implication in the prosecution's argument, a defendant acquitted on the grounds of insanity may be confined in an institution for at least the duration of the maximum sentence and will not be released without a judicial hearing and a finding of restored sanity; if he continues to be a danger to society, he can be held beyond the maximum term. (Pen. Code, § 1026.2-1026.5; see *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 173-174 [167 Cal.Rptr. 854, 616 P.2d 836].) The prosecution's remarks were incurably prejudicial here since the shooting of Mrs. Joiner occurred because of appellant's October 1979 release and the failure to promptly initiate the Penal Code sections 1026.2-1026.5 procedures. (Cf., *People* v. *Haskett* (1982) 30 Cal.3d 841, 860-861 [180 Cal.Rptr. 640, 640 P.2d 776].)

## IV

Finally, we turn to appellant's contentions pertaining to the refusal of CALJIC Nos. 3.35 and 8.78 during the guilt phase.

■ Appellant contends the trial court erred when it refused to instruct with CALJIC No. 8.78, which explained in general terms the relationship between "irresistible impulse" evidence and the defense of diminished capacity.[3] Explaining its refusal to instruct with CALJIC No. 8.78, the court stated, "There has been no testimony here regarding 'irresistible impulse.' The only testimony in regard to his act was an evaluation by Dr. Gudiksen that he heard voices, which were called 'command hallucinations,' directing him to kill, which I don't think is an irresistible impulse."

■ The trial court must give a requested instruction only if the defendant proffers evidence sufficient to deserve consideration by the jury; such evidence is that from which a jury composed of reasonable persons could have

---

[2]". . . If *a person is a danger to be put out into the streets,* doesn't make him *legally insane* anymore than having Charles Manson up in one of the State prisons and saying, 'Here, this man is up in the prison,' and saying, 'This man is dangerous. *Don't let him out.' We are not saying he is sane or insane. We are just saying, 'Don't let him out. He is dangerous.'* [¶] "Let's talk about normal everyday life and the people that are sane that commit crimes."

[3]CALJIC No. 8.78 states: "In determining if defendant had diminished mental capacity, if there was evidence that defendant's act was the product of an irresistible impulse, you must consider whether or not such irresistible impulse, if any, was due to mental illness, mental disease or mental defect so as to render defendant incapable of forming the mental states essential to murder or voluntary manslaughter."

concluded that the particular facts underlying the instruction did exist. (*People* v. *Barrick* (1982) 33 Cal.3d 115, 132 [187 Cal.Rptr. 716, 654 P.2d 1243]; *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].) In evaluating the evidence to determine whether a requested instruction should be given, the trial court should not measure its substantiality by weighing the credibility of the witnesses, as that task is exclusively for the jury. If the evidence is "minimal and insubstantial," however, the court need not instruct on its effect. (*Ibid.*) Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused. (*Id.*, at p. 685.)

Appellant argues that Dr. Gudiksen's testimony about his auditory command hallucinations and his own statements in his confessions about the voices which he heard amounted to ample evidence to justify the irresistible impulse instruction. Respondent argues that the evidence on irresistible impulse was minimal and insubstantial. The gist of respondent's argument seems to be that a planned killing such as that involved here cannot be the result of an irresistible impulse.

Respondent's position is based on a misunderstanding of the irresistible impulse aspect of the diminished capacity defense in this state. ■ The words "irresistible impulse" do convey an implication of a sudden, unplanned action, and a few courts have interpreted that language as does respondent in this case. (See Goldstein, The Insanity Defense (1967) pp. 67-69; see also *Wade* v. *United States* (9th Cir. 1970) 426 F.2d 64, 67.) We find no case in this state, however, in which the irresistible impulse concept has been so narrowly restricted. On the contrary, in *People* v. *Drew, supra,* 22 Cal.3d 333, in which the Supreme Court rejected the M'Naghten test of legal insanity because of its exclusive focus on the cognitive capacity of an accused, the court explained that the irresistible impulse concept was developed "to supply the volitional element lacking in the M'Naghten test." (*Id.*, at p. 344.) Similarly, in *People* v. *Cruz, supra,* 26 Cal.3d 233, the court commented that the defense of diminished capacity is "very close to that of insanity as defined by the A.L.I. [American Law Institute] test, though the tactics and results of successful use of the two defenses are different." (*Id.*, at pp. 251-252, fn. omitted; see also Comment, *People* v. *Drew: California Adopts the ALI Insanity Test* (1979) 67 Cal.L.Rev. 706, at p. 721, fn. 71.) In other words, the irresistible impulse aspect of the diminished capacity defense applied to the defendant who, because of a mental disease or disorder, was unable to conform his conduct to the requirements of the law.

■ Here Dr. Gudiksen testified not just that appellant heard command hallucinations which directed him to kill, but also that he followed those

commands as other people would follow rational orders. She believed he felt he had to obey those commands. That evidence seems sufficient to warrant giving the irresistible impulse instruction.

A refusal to instruct may not be prejudicial, however, if it is possible to determine that the jury determined every material issue presented by the evidence under other properly given instructions. (See *People* v. *Sedeno* (1974) 10 Cal.3d 703, 720-721 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Crosier* (1974) 41 Cal.App.3d 712, 726-727 [116 Cal.Rptr. 467].) We have concluded that the court did not remove the issue of the effect of appellant's command hallucinations from the jury by refusing to instruct with CALJIC No. 8.78. The court did instruct in the language of CALJIC No. 8.77 that a defendant's diminished capacity could affect his ability to maturely and meaningfully premeditate, deliberate and reflect upon the gravity of his act, and could affect his ability to form malice. The jury was also instructed with CALJIC No. 8.41 on the relationship between diminished capacity and voluntary manslaughter.[4] When Dr. Gudiksen testified about appellant's de-

---

[4]The trial court delivered CALJIC No. 8.77 as follows: "If you find from the evidence that at the time that the alleged crime was committed the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter.

"Thus, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he did, maturely and meaningfully, premeditate, deliberate, and reflect upon the gravity of his contemplated act, or form an intent to kill, you cannot find him guilty of a willful, deliberate and premeditated murder of the first degree.

"Also, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to form the mental states constituting either express or implied malice aforethought, you cannot find him guilty of murder of either the first or second degree.

"And if you have a reasonable doubt whether he was able to form an intention unlawfully to kill a human being, or whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or whether he did act despite that awareness, you cannot find that he harbored express malice.

"Further, if you have a reasonable doubt as to whether his acts were done for a base, antisocial purpose, or whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or whether he did act despite that awareness, you cannot find that he harbored implied malice.

"Furthermore, if you find that as a result of mental illness or defect his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed, you cannot find him guilty of either murder or voluntary manslaughter."

The trial court also delivered CALJIC No. 8.41 as follows: "Voluntary manslaughter is the intentional and unlawful killing of a human being without malice aforethought.

"Now I pause here to point out voluntary manslaughter is the intentional killing of a human being, so that the person, for voluntary manslaughter, has to have the intent to kill.

"As applicable in this case, there is no malice aforethought if the evidence shows that due to diminished capacity caused by mental illness, mental defect, or other cause the defendant did not have the capacity to form the mental state constituting malice aforethought, even though the killing was intentional, voluntary, deliberate, premeditated, and unprovoked."

lusions and his belief that he had to kill Joiner or be killed, she stated that his lack of control made him unable to deliberate and premeditate and form malice aforethought. She explained that because of his command hallucinations, he was unable to carefully weigh the consequences of shooting Joiner, and was unable to consider society's moral and legal constraints against killing where Joiner was concerned. It is apparent that when the jury convicted appellant of first degree murder, it rejected Gudiksen's theory that appellant's command hallucinations rendered him incapable of forming the mental states essential to that offense. Appellant does not explain how instructing with CALJIC No. 8.78 would have changed the issue which was presented to the jury.

■ Appellant also contends the trial court erred when it refused to instruct with CALJIC No. 3.35,[5] the "Wells-Gorshen" instruction. (*People v. Wells* (1949) 33 Cal.2d 330 [202 P.2d 53]; *People v. Gorshen* (1959) 51 Cal.2d 716 [202 P.2d 53].) The trial court's refusal was on the ground that the information in the instruction was adequately covered by other instructions. We agree. CALJIC No. 3.35 states the general rule with respect to diminished capacity, whereas CALJIC Nos. 8.77 and 8.41, which the trial court did give, more specifically relate that rule to the mental states necessary for murder and manslaughter. The court is not required to give repetitious instructions. (See *People v. Scola* (1976) 56 Cal.App.3d 723, 728 [128 Cal.Rptr. 477].)

The judgment finding appellant sane as to first degree murder is reversed, and remanded. In all other respects, the judgment is affirmed consistent with the opinions expressed.

Feinberg, J.,* concurred.

**SCOTT, J.**—I dissent from that portion of the majority's opinion reversing the jury's sanity verdict.

As the majority acknowledges, a jury may find a defendant sane despite unanimous expert opinion to the contrary. (*People v. Drew* (1978) 22

---

[5]CALJIC No. 3.35 states: "When a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent or mental state essential to constitute the crime or degree of crime with which he is charged.

"If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent or mental state, you must give defendant the benefit of that doubt and find that he did not have such specific intent or mental state."

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

Cal.3d 333, 350 [149 Cal.Rptr. 275, 583 P.2d 1318], and cases cited therein.) " 'To hold otherwise would be in effect to substitute a trial by "experts" for a trial by jury . . . .' [Citation.]" (*People* v. *Samuel* (1981) 29 Cal.3d 489, 498 [174 Cal.Rptr. 684, 629 P.2d 485].) Moreover, a reviewing court must view the evidence with respect to a finding of sanity in the light most favorable to the jury's verdict. (*Id.*, at p. 505.)

A defendant has the burden of proof on the issue of insanity, and if neither party presents credible evidence on the issue, the jury must find the defendant sane. Therefore the question for the reviewing court is not actually the sufficiency of the evidence to support the jury's finding of sanity; rather, the question is whether the evidence contrary to that finding is of such weight and character that the jury could not reasonably reject it. (*People* v. *Drew, supra,* 22 Cal.3d at p. 351.) In other words, before an appellate court can overturn a jury's finding of sanity on the ground that it is unsupported by the record, the court must find that the defendant is insane as a matter of law. (*People* v. *McCarthy* (1980) 110 Cal.App.3d 296, 300 [167 Cal.Rptr. 772].) In this case, however, although the majority has not concluded that appellant is insane as a matter of law, it has still reversed the jury's verdict. I cannot agree with that result.

The majority has concluded that there were no circumstances present allowing the jury to reject the unanimous expert opinion at the sanity phase of the trial that appellant was insane. I disagree. A jury may reasonably reject expert psychiatric opinion that a defendant is insane on the ground that the psychiatrist has not presented sufficient material and reasoning to justify that opinion. (*People* v. *Drew, supra,* 22 Cal.3d at pp. 350-351.) First, the jurors in this case may well have rejected Dr. Morris' testimony because they found his reasoning unpersuasive. During the guilt phase, it was Morris' opinion that appellant was in partial remission at the time of the offense, and could form the intent to kill, premeditate, deliberate, and form malice aforethought. At the sanity phase, however, he testified that appellant's disease caused the killing, and that appellant lacked substantial capacity to conform his conduct to the requirements of the law and to appreciate the criminality of his conduct. Morris testified that as he viewed it, his testimony was not inconsistent, but he failed to explain why. (See *People* v. *Cruz* (1980) 26 Cal.3d 233, 251-252 [162 Cal.Rptr. 1, 605 P.2d 830] [defense of diminished capacity "very close" to American Law Institute insanity test].) The majority itself describes Dr. Morris' unexplained reversal of his opinion as "undoubtedly confusing."

A reasonable jury may also have found Dr. Gudiksen's testimony unpersuasive. The jury may well have been skeptical about the material upon which Dr. Gudiksen based her opinion that appellant had no choice but to

follow the orders of his voices, because her information about those voices had to come from appellant himself. Moreover, the jury may have believed that Gudiksen's reasoning did not support her conclusions. For example, she believed that with respect to the shooting of Joiner, appellant was legally insane. However, she also testified that on the date of the shooting, appellant would have known it was wrong to commit a robbery or other crime against any individual who was not part of his delusional system, and would have been able to conform his conduct to the requirements of the law with respect to such an individual. She testified that appellant's disease had been characterized by periods of partial remission, and that had he been in remission on the date of the offense, he might have been able both to appreciate the criminality of his conduct and conform to the requirements of the law with respect to Joiner. She testified that at times in the past he seemed to know better than to listen to his voices. She admitted that she did not know whether he was taking his medication at the time of the offense, and the evidence with respect to that fact was contradictory.

The jury may have found Dr. Boyse's testimony unpersuasive for similar reasons. The jury may have been skeptical about appellant's reports to Boyse about his hallucinations. As did Gudiksen, Boyse testified that while appellant would have known better than to commit a robbery, he did not appreciate the criminality of his conduct with respect to the shooting of Joiner; however, Boyse also failed to clarify why appellant's disease would result in that narrowly limited incapacity.

Furthermore, in addition to evaluating all the psychiatric testimony, the jurors in this case were entitled to consider factors such as appellant's apparent ability to devise and execute a deliberate plan, and the manner in which the crime was conceived and executed, all of which support the finding of sanity. (*People* v. *Wolff* (1964) 61 Cal.2d 795, 805 [40 Cal.Rptr. 271, 394 P.2d 959].) In its review of the record, the majority ignores that evidence. The majority has in fact simply reweighed all the evidence and has come to a different conclusion than the jury. Clearly the majority has departed from the proper standard of judicial review.

My colleagues cite no case in which an appellate court has upset a jury verdict that a defendant was sane when the crime was committed on the ground that the verdict lacked support in the trial record. Instead, they rely upon *People* v. *Samuel, supra,* 29 Cal.3d 489 in which the court set aside a jury's finding of competence to stand trial because of "virtually uncontradicted" evidence of the defendant's incompetence. *Samuel,* however, is readily distinguishable from this case. In *Samuel,* the court recognized that in the past it had called into question the value of expert opinion on the issue of legal sanity. It pointed out, however, that the experts who examined

the defendant were asked not to speculate about his state of mind at the moment a crime was committed, but to assess his present mental abilities on the basis of observation and examination continuing up to the very week of the competency hearing. (*Id.*, at pp. 502-503.) The court also acknowledged the deference ordinarily due the findings of the trier of fact, but offered three reasons why it was less hesitant than usual to subject the jury verdict to close scrutiny. First, no constitutional right of the People or the defendant was involved, as the right to a jury in Penal Code section 1368 hearings is statutory. Second, there was no real conflict in the expert testimony; the question was not whose version of the facts to believe, but what to conclude from the undisputed facts. Finally, reversing the finding of competence did not necessarily affect the question of guilt or the penalty to be assessed. (*Id.*, at pp. 505-506.)

Opposite considerations are present in this case. Here the experts were being asked to speculate about appellant's state of mind and volitional capacity at a prior moment, not at the time of trial. This was not a proceeding in which the right of all the parties to a jury verdict was only statutory. (Cf. *People* v. *Hill* (1967) 67 Cal.2d 105, 114 [60 Cal.Rptr. 234, 429 P.2d 586].) The facts were not all undisputed; for example, the evidence as to whether appellant was taking Stelazine or other medication after his release from the hospital and at the time of the killing was contradictory and inconclusive. Moreover, disturbing the jury's verdict in this case would directly affect the question of guilt and penalty. In short, *Samuel* is not at all similar to this case, and does not support the majority's reversal of the sanity judgment.

The majority's disposition of this appeal is subject to criticism for an additional reason. A defendant who prevails in his claim that the jury's finding of sanity is not supported by the evidence is entitled to an order directing the trial court to find him insane. (*People* v. *Drew, supra,* 22 Cal.3d at p. 349.) Here, however, the majority reverses the judgment finding appellant sane, and remands, presumably for a new trial on the issue of sanity. The failure to direct the trial court to find appellant insane suggests that the majority is unable or unwilling to acknowledge the legal effect of its decision. The majority has in fact usurped the function of the jury, and its order reversing and remanding attempts to cloud the effect of its judgment.

I also cannot agree that the prosecutor's remarks during closing argument require reversal of the sanity verdict. Read in context, the prosecutor's comments were an attempt to explain the objections of the district attorney's office to appellant's 1979 release, not an appeal to the jury to find appellant sane despite the evidence in order to protect society.

Appellant's other complaints of prejudicial prosecutorial misconduct during the sanity phase of the trial are also without merit. First, appellant complains that the prosecutor improperly tried to question Dr. Boyse about whether he used a so-called "baby-fat test" on appellant, and then referred to the test again during argument to discredit Boyse. Appellant exaggerates the effect of the prosecutor's conduct. The initial questioning of Boyse was not improper, as the prosecutor was entitled to cross-examine Boyse to determine the material upon which his opinion was based, and the reasons for his opinion. (See *People* v. *Nye* (1969) 71 Cal.2d 356, 374-375 [78 Cal.Rptr. 467, 455 P.2d 395], cert. den., 406 U.S. 972 [32 L.Ed.2d 672, 92 S.Ct. 2417].) When the prosecutor referred to the test during argument, defense counsel correctly pointed out that there was no evidence either of the nature of the test or of Boyse's opinion of the test in the record. The court then stated that the jury was to determine what had been said and not said, and the references to baby fat ceased. Given the court's admonition, I fail to see how appellant has been prejudiced by the prosecutor's remarks.

Appellant contends the prosecutor committed other acts of misconduct by referring to matters not in evidence. As for the prosecutor's reference to appellant's use of drugs and to jail inmates' attitudes about appellant, any harm was cured when the court sustained defense counsel's objections to the comments. As for the prosecutor's reference to Charles Manson, a timely objection and admonition would have cured any harm, but defense counsel did not object; therefore I would not consider that issue. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].)

I would affirm the judgment in its entirety.

Respondent's petition for a hearing by the Supreme Court was denied February 21, 1985. Mosk, J., Kaus, J., and Lucas, J., were of the opinion that the petition should be granted.