[No. B035694. Second Dist., Div. Seven. Mar. 29, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE JEROME GATLIN, Defendant and Appellant.

**COUNSEL**

James W. Haworth, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Martin S. Kaye and Landra E. Rosenthal, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LILLIE, P. J.—A six-count information charged three females, Norris, Webster and Sperling, with four counts of second degree burglary (1 through 4), defendant and the three females with receiving stolen property ([clothing] count 5), and defendant alone, with receiving stolen property ([check] count 6), and alleged he suffered two prior prison terms (§ 667.5, subd. (b), Pen. Code). Two of the females, Norris and Webster, absconded and could not be tried; only Sperling remained to be tried with defendant— Sperling on counts 1 through 5, defendant on counts 5 and 6. Trial was had, commencing March 12 through March 19. On the third day of trial defendant also absconded, bail was revoked, a bench warrant issued and the rest of the trial was conducted in defendant's absence. The jury found Sperling guilty on all counts, and defendant guilty on count 5 (receiving stolen property [clothing]) and the special allegation to be true, but deadlocked on count 6 which later was dismissed. Defendant appeals from the judgment.

FACTS

On August 5, 1985, defendant was seen in the company of the three female codefendants, Norris, Webster and Sperling who, on that afternoon, entered a series of shops in El Rancho Shopping Center where they stole merchandise and secreted it in their pockets and full skirts. Defendant accompanied two of the female codefendants into one store, a shop owned by Marsha Thomson, where he conversed with a clerk while the women roamed through the shop; under the watchful eye of the owner, the women were unable to steal any merchandise and left with defendant; the three departed in a late model blue Cadillac parked in front. A short time later the owner of another shop observed the blue Cadillac in the parking lot; a man was driving. The three women entered four more shops from which merchandise was stolen; one of the owners saw them enter a blue Cadillac, took the license number and called police.

A short distance away, officers stopped the Cadillac; codefendant Sperling was the driver, defendant was seated in the front passenger seat and Norris and Webster sat in back with a mound of clothing between them; the trunk was filled with clothing. In the glove compartment were a postal receipt showing $1,500 worth of new clothes had been mailed to a party in Los Angeles, and a computer list of a nationwide chain of stores, including those from which merchandise had been stolen. Shop owners in El Rancho Center were taken to the scene and the mound of clothing on the back seat was identified by them as clothing stolen from their shops shortly before, and the three women codefendants were identified as having been in the

shops at the time. A strip search of the women found two wearing girdles with long legs extending to mid-calf identified as "booster girdles" used to conceal stolen property.

## I

### MOTIONS FOR CONTINUANCE, MISTRIAL AND/OR SEVERANCE PROPERLY DENIED

On Wednesday March 12 about 4:30 p.m., before the trial began but after the jury was sworn, the prosecutor and defendant's counsel were examining a police report when they discovered the existence of three audio tapes of conversations purportedly between the female codefendants and others, made surreptitiously in a holding cell. Because of the late hour, copies of the tapes could not be made and delivered to defense counsel until 9 a.m. the next day (Mar. 13). On Thursday morning, March 13, the trial was delayed 90 minutes to permit her to listen to the tapes. The tapes, marked 49-A, 49-B, 49-C for identification, although lodged with the superior court file for the purpose of review by this court and thus made a part of the record before us, were not received in evidence.[1] We have listened to the tapes, giving particular attention to that portion (49-C) pointed up and relied upon by appellant in his opening brief. Claiming that one of the tapes

---

[1] At the conclusion of argument on the renewed motions for mistrial and continuance, and stating, "I would like to have them. The tapes made are not a part of the case. But in the court's file—," the prosecutor was asked by the court if they were to be marked for identification and admitted into evidence, and he replied "Yes. And so that whoever reviews this case can listen to the tapes." However, it is clear from the following that neither were the tapes actually received in evidence nor did the parties or the court believe them to have been admitted. At the close of the People's case, the prosecutor made his formal request that the various exhibits be received in evidence, but when he came to the tapes the following colloquy occurred:

"THE CLERK: 49-A, B, C are the three tapes.

"MR. HANFORD [prosecutor]: They have been marked for the court's record.

"THE COURT: They are not received in evidence.

"MR. HANFORD: They are not received in evidence.

"THE COURT: No. They are marked for purposes of use by the reviewing court.

"MR. HANFORD: Fine.

"MRS. SWANBERG [defense counsel]: No, those are lodged with the file.

"THE COURT: Yes.

"MR. HANFORD: Yes."

Thereafter, defense counsel moved the tapes be admitted in evidence as declarations against interest, but objection thereto interposed by the prosecutor was sustained, and the tapes were never received in evidence. Further, the exhibits listed in the reporter's transcript of the trial proceedings do not include the tapes (49-A, 49-B and 49-C); the list shows they were only marked for identification but not admitted in evidence. Finally, on the face of each of the three tapes in large bold lettering and printed in black ink is the word "NOT" above the word "Admitted."

contained exculpatory evidence,[2] defense counsel requested a continuance to determine how she might use it, and moved for a mistrial because the tapes had not been turned over to her earlier, although she did concede, "I do not think he [prosecutor] knew about their existence." Asked by the court if he joined in the motion, counsel for codefendant Sperling replied "I'm not joining in that matter." The request and motion were denied.

The trial proceeded; at the beginning of the afternoon session, again based upon late discovery of the tapes, defense counsel renewed her motion for mistrial and/or continuance. She claimed she wanted time to analyze the tapes and decide how they might be admissible. When the trial court indicated that the statements would be admissible for impeachment only, defense counsel replied, "I think you may be right as to that point," then argued that severance should be granted so she could call codefendants, specifically Sperling, to testify to exonerate defendant and if she failed to exonerate him, she could impeach Sperling with the taped statements. During the noon hour the prosecutor had two sets of the tapes transcribed and gave one to defense counsel. The trial court overheard a portion of the tapes and heard the opening statement of the prosecutor; and because there was confusion as to who made the statements and the court doubted the tapes contained any reliable exculpatory evidence, had no information any of the three codefendants would be willing to testify favorably for defendant, noted counsel would have the coming weekend in which to deal with the tapes and nothing contained therein would justify a mistrial, continuance or severance, denied the motions with the understanding that if, after counsel goes over the tapes, it turns out the court is wrong, it would consider a motion for new trial if defendant is convicted. Such a motion was made and denied.

---

[2] The tapes and that portion directed to our attention, which contains the conversation in question (49-C), are largely unintelligible and difficult if not impossible to understand. However, from what we are able to hear and understand on the tapes and from what we can piece together from the statements of defense counsel, the prosecutor, the trial court and appellant in his opening brief, the following appears to have occured. When arrested, the three female codefendants were given their *Miranda* rights which they refused to waive; they were put in a holding cell with others including at least one police officer; tape recording equipment was surreptitiously activated. The tapes are very noisy, much was said and many statements were made; various voices are heard at once; the women are yelling back and forth to each other, laughing, joking and swearing; there is great noise and confusion in the background, there "is a myriad of statements. And it just goes on and on and on of them talking with the police . . . ." There has been no identification of voices and they cannot be identified. Out of the noise and confusion it appears that a police officer recited the charges (burglary) being filed against each of the three women codefendants; female voices are heard; among other things, the officer stated defendant is being booked on burglary, whereupon various female voices responded, "Burglary?" "He got nothing to do with that." "He got nothing to do with it." "He really don't." "Well, I don't either officer." "I don't either, so." "We don't either, so." The sense of the statements is that upon being told defendant was being booked for burglary, the women replied he had nothing to do with burglary, and neither had they.

## A. *Motion for Mistrial*

■ Appellant claims he was entitled to have a mistrial declared based on untimely discovery of the tapes. ■ A motion for mistrial presupposes error plus incurable prejudice. " 'The burden is on the accused to establish prejudice where there has been a lack of timely discovery, and in the absence of prejudice the judgment must be affirmed.' [Citation.]" (*People* v. *Claxton* (1982) 129 Cal.App.3d 638, 657-658 [181 Cal.Rptr. 281]; *People* v. *Romero* (1977) 68 Cal.App.3d 543, 548 [137 Cal.Rptr. 675]; see also *People* v. *Woodberry* (1970) 10 Cal.App.3d 695, 708 [89 Cal.Rptr. 330].) ■ Thus, we examine the record to ascertain if there was an abuse of discretion in denying the motion. (*People* v. *Woodberry, supra,* 10 Cal.App.3d 695, 708.) We conclude there was not.

Although discovery was untimely in the sense the existence of the tapes was not discovered until just before trial, nothing establishes, as in *People* v. *Ruthford* (1975) 14 Cal.3d 399, 401, 409 [121 Cal.Rptr. 261, 534 P.2d 1341, A.L.R.4th 3132], any fault attributable to the prosecutor. There was no prosecutorial misconduct and, certainly, he breached no duty to disclose favorable evidence of substantial materiality in his possession. Nothing suggests that he knew of the existence of the tapes or could have produced them earlier, and defense counsel made no such claim below conceding she did not believe the prosecutor knew of their existence.

However, appellant has shown no prejudice because of the belated discovery. When the trial court noted the statements on the tape would be admissible only for impeachment, defense counsel said she thought it may be right; then the court asked "Who are you going to impeach here?" and she replied, codefendants, specifically Sperling, and if she is called on behalf of defendant and if she fails to exonerate him, she could use the tape to impeach her. But clearly there was no showing any of the women would be available to or would testify, and if so, what that testimony might be. Norris and Webster had disappeared. The refusal of counsel for Sperling to join in defendant's motions and his reluctance to discuss with the court what her version of the charges might be, suggest an unwillingness of Sperling to cooperate. Defense counsel waltzed around the issue whether Sperling would testify for defendant, and what she might say. In asserting that "it was uncontradicted Sperling would in fact testify following the completion of her trial," the dissent can only rely on defense counsel's statements to the trial court; but none of those statements was definitive in nature or actually represented to the trial court that Sperling would testify at defendant's trial, and the trial court was not willing to accept them as such, nor are we. Defense counsel's statements to the court were vague, general and based on counsel's "opinion" or an unsupported "indication" or unexplained "reason

to believe" or upon the statements made by codefendants on the tape as interpreted by defense counsel.[3] We are unable to find in the record one statement made by defense counsel to the court that Sperling in fact would testify for defendant at another trial, and defense counsel received no encouragement from Sperling's counsel. Neither Sperling nor her counsel enlightened the trial court concerning what if anything Sperling intended to do, although her counsel did complain, "Those tapes were taken after my client stood on her *Miranda* rights. And I'm not interested in the tapes and don't feel that they're necessary." Sperling did not testify in her own trial. Given the foregoing, it is likely Sperling would invoke her Fifth Amendment privilege if called to testify for defendant. In any case, no showing was made that Sperling could or would be of any assistance to defendant.

Appellant says the statements of the female codefendants that he did not have anything to do with burglary, nor did they, undercut the People's case by exonerating him. We do not agree. Defendant was not charged with burglary, only with two counts of receiving stolen property. Clearly, the statements as such could not exculpate him. He counters with an appealing but unacceptable argument that the statements are "highly relevant" and do exonerate him because the prosecutor argued to the jury that he was an aider and abettor in the burglaries thus, had knowledge the clothing was stolen; and it was an "extremely close" case.

First, although defense counsel well knew what the trial evidence would show, she advanced no such argument in the trial court. Second, the purported statements of the female codefendants that defendant had nothing to do with the burglary, at best, are legal conclusions; they address neither the factual nor legal issues in the case, and do not exonerate defendant of

[3] "I do have *some indication* that the codefendant, if called, would exonerate my client. And that indication being, again, *due to evidence that I have heard on the tape*."

"I have *reason to believe* that if her trial was completed and resolved, she would be willing to testify."

"And in my opinion, *based upon the tapes that I have* heard, the likelihood that the testimony will exonerate my client is great."

Asked point blank by the court if she had talked to Sperling to know what she would say if she was called, defense counsel answered, "Your Honor, she is represented by counsel. But *I have reason to believe,* based on discussions in chambers, that where [*sic*] her case were resolved, she would be willing to testify."

In a final colloquy between the court and defense counsel, counsel told the court, "I do have *reason to believe* that if her trial were completed, I have *reason to believe*—because of remarks that cocounsel has made to me concerning her reason for not wanting to testify; which is her fear she will be punished in some way by testifying." However the court responded, "Just yesterday he [counsel for codefendant Sperling] was talking with the district attorney, myself and you about the possibility of his client being a witness against your client in court," whereupon defense counsel agreed that was correct, but believed there were some discussions in which cocounsel "expressed some of the things he thought his client would say. And in *my opinion,* those things at the time could exculpate my client." (Italics added.)

receiving stolen property. Third, whether or not the evidence falls into the legal concept of aiding and abetting burglary, the evidence, as counsel well knew it would, showed defendant was seen in the company of the female codefendants on the afternoon the three women went on their shoplifting spree, he was seen in the Cadillac, and he was apprehended in the vehicle with the codefendants with their stolen merchandise in a mound on the rear seat between two of them. This was offered to establish, not that defendant was guilty of aiding and abetting burglary but, regardless of how the evidence is characterized, that he could not help but know that the growing mound of clothing had been stolen. ▮ Fourth, we reject appellant's argument that statements of the female codefendants are declarations against interest because they would not know he had nothing to do with burglary had they themselves not been involved. Given their statements that neither had they anything to do with burglary, the only reasonable inference is that none of the four had anything to do with burglary because they were all together elsewhere, or that they did go into the shops but did not do so to steal and did not take anything. ▮ Finally, we perceive this to be far from the "extremely close" case on the evidence described by appellant. Appellant has failed to demonstrate he was prejudiced by discovery of the tapes on the eve of trial.

## B. *Request for Continuance*

▮ Nor do we find an abuse of discretion in the denial of a continuance. ▮ A continuance will be granted in a criminal proceeding only upon a showing of good cause (Pen. Code, § 1050, subd. (e)), and what constitutes good cause is a factual question to be determined by the trial court. ▮ "The granting or denial of a motion for a continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion. In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of his motion for a continuance cannot result in a reversal of a judgment of conviction. [Citation.]" (*People* v. *Laursen* (1972) 8 Cal.3d 192, 204 [104 Cal.Rptr. 425, 501 P.2d 1145].) ▮ Appellant here fails to demonstrate and our examination of the record fails to disclose either resulting prejudice or an abuse of discretion.

▮ ▮ When the prosecution intends to offer belatedly discovered evidence against a defendant, grant of defendant's request for continuance is the proper remedy (*People* v. *Reyes* (1974) 12 Cal.3d 486, 501-502 [116 Cal.Rptr. 217, 526 P.2d 225]); however, the prosecutor had no intention of

using the tapes. ██ The same remedy should be available to a defendant to investigate potentially exculpatory evidence belatedly discovered. ██ However, we reject the contention that good cause was shown in the opportunity it would have provided defense counsel to discover whether or not the tapes contained exculpatory statements admissible as declarations against interest, and to determine whether or not severance of trial was mandated. Before the trial, defense counsel heard the tapes; she then knew the portion she claimed exonerated defendant and pointed it out to the court; that afternoon (Thurs., Mar. 13) the prosecutor made available to her a set of tape transcriptions. The trial proceeded through March 19, and a weekend intervened. On the third day of trial, defendant absconded and was absent thereafter. The trial court felt she had ample time to analyze the tapes and determine if she could use them; we agree. Further, she had ample opportunity to and did argue to the trial court, although unsuccessfully, that the tapes were declarations against interest and admissible as exceptions to the hearsay rule—on the motions before trial, on the renewed motions during trial, when she offered the tapes in evidence at the close of the People's case and on motion for new trial. Finally, the jury had been sworn and was waiting for trial to begin.

As for the prosecutor, he maintained the tapes "are not admissible" and he would not use them; as for defendant, he failed to establish their contents were potentially exculpatory and could be used for such purpose or could be used for impeachment or that they were admissible under any exception to the hearsay rule; and as for the trial court, it was of the opinion the tapes "wouldn't be admissible except as impeachment," and defense counsel conceded it may be right. In denying the motion, the trial court commented that "we really don't know who made the statement. We don't know what the witness would say if called. We don't know whether that witness could be impeached. It's all too highly speculative"; and that it would be interested in any information that one of the three female defendants, if available, would testify to exonerate defendant or testify in such a way as to be impeached by evidence that would tend to exonerate him and in which the jury could have confidence.

Speculative it was, and the lack of any information concerning the availability of any of the codefendants, their willingness to testify and their proposed testimony left the court bereft of the necessary information. Norris and Webster had absconded and were unavailable, and no showing was made that Sperling would testify. The court reminded defense counsel she had the weekend to do further investigating then added, "I don't know that if you have a month you can get much of the tape that would help you." Clearly, the trial court considered the possible benefit to defendant, but found it unlikely such benefit would result, the burden on the parties and

the court, and whether substantial justice would be accomplished or defeated by granting the motion. ■ Trial courts possess broad discretion in ruling upon requests for continuances, and on appeal a reviewing court will not disturb a denial of such request in the absence of a clear abuse of discretion. (*People* v. *Duck Wong* (1976) 18 Cal.3d 178, 189 [133 Cal.Rptr. 511, 555 P.2d 297].)

## C. *Motion for Severance*

■ The trial court has discretion in ruling on a motion for severance. (Pen. Code, § 1098.) Under the statute the Legislature declared joint trials to be the rule and separate trials the exception. (*People* v. *Massie* (1967) 66 Cal.2d 899, 923 [59 Cal.Rptr. 733, 428 P.2d 869].) Two major considerations come into play—whether the separate trials would have been less prejudicial than the joint trial, and whether there was clear evidence of defendant's guilt. (*People* v. *Ortiz* (1978) 22 Cal.3d 38, 46 [148 Cal.Rptr. 588, 583 P.2d 113]; *People* v. *Massie, supra,* 66 Cal.2d 899, 921.)

■ This is not the ordinary case in which something inherent in a joint trial, such as a multiple number of defendants or evidence admissible against one but not against another, would be prejudicial to defendant. Here the request for a separate trial was made solely to permit defendant to call one of his codefendants to testify on his behalf and if she fails to exonerate him, to impeach her by use of the tape. We do not belabor the matters already covered in this opinion other than to say that the lack of "showing made at the time the motion [was] made" (*People* v. *Alvarado* (1967) 255 Cal.App.2d 285, 289 [62 Cal.Rptr. 891]) fully justifies the exercise of judicial discretion in the denial of the motion. In addition, although appellant characterizes the statements of the women as unsolicited and spontaneous, they appear to be in response to a police officer's statement that easily could be construed as having elicited them. Apparently Sperling's counsel felt this to be the case for he commented that any statement attributable to her was made after Sperling invoked her *Miranda* rights.

■ "[A]ny abuse of discretion in the denial of a motion for severance must be determined upon the showing at the time the motion is made. (*People* v. *Brawley* (1969) 1 Cal.3d 277, 292 [82 Cal.Rptr. 161, 461 P.2d 361].)" (*People* v. *Wallace* (1970) 13 Cal.App.3d 608, 617 [91 Cal.Rptr. 643].) ■ At the time defendant moved for severance, defendant offered no basis on which to conclude the tapes would be admissible for any purpose other than possible impeachment, no reason to presume that any of the codefendants would be willing to or could testify on behalf of defendant and no way to establish the reliability of the holding cell statements or even who made the statements. Defendant's proposed use of the tape was wholly

speculative. Appellant takes comfort in describing this as a close case, but the evidence reflects the clear evidence of his guilt.

Separate trials were not justified. Considering that there is a statutory preference for joint trials (Pen. Code, § 1098; *People v. Massie, supra,* 66 Cal.2d 899, 923), the lack of showing made when the demand was made (*People v. Brawley* (1969) 1 Cal.3d 277, 292 [82 Cal.Rptr. 161, 461 P.2d 361]; *People v. Clark* (1965) 62 Cal.2d 870, 883 [44 Cal.Rptr. 784, 402 P.2d 856]), the failure of appellant to show the separate trial would have been less prejudicial than the joint trial (*People v. Ortiz, supra,* 22 Cal.3d 38, 46), the wholly speculative use of the tape, and the clear evidence of defendant's guilt (*People v. Massie, supra,* 66 Cal.2d 899, 921), we find no abuse of judicial discretion in the denial of the motion for severance.

## II

### TAPES PROPERLY EXCLUDED AS EVIDENCE

■■■ At the close of his case when the prosecutor moved to admit certain other exhibits, defense counsel moved to admit the tapes "for purposes of this trial as declarations against interest relative to my client's involvement in the incident." The prosecutor's objection, for lack of foundation and the statements are only "hearsay statement[s] by some females," was sustained. Appellant challenges this ruling on the basis the tapes constitute declarations against interest, they were admissible under Evidence Code section 1230, and their exclusion constitutes prejudicial error.

Defense counsel sought to place the tapes before the jury by moving for severance, arguing that she could use the tapes to corroborate or impeach Sperling, but based upon a lack of showing that any of the female codefendants would testify on behalf of defendant, the fact that their statements do not exonerate him, and the statements are self-serving, we have sustained the order denying the motion. To the extent that denial of defendant's motion to admit the tapes in evidence was based upon denial of the severance motion, the ruling was not error.

To the extent the content of the tapes is revealed in the record, it fails to meet the criteria for admissibility under section 1230, Evidence Code, specifically, the statements do not constitute declarations against interest. The female codefendants do not admit their own culpability in or liability for burglary, in fact, they are emphatic in their denials that they had anything to do with burglary. Unquestionably these statements are self-serving. We have hereinbefore rejected appellant's argument that the female codefendants had to have knowledge of or have been involved in the burglaries in

order to state he was not responsible for burglary, thus the statements were declarations against interest. This argument completely ignores the denials by the female codefendants of their own culpability. Section 1230 is not applicable to evidence of any statement not itself specifically disserving to the interests of the declarant. (*People* v. *Leach* (1975) 15 Cal.3d 419, 441 [124 Cal.Rptr. 752, 541 P.2d 296].) In the context of these tapes, any statement that defendant had nothing to do with burglary is not specifically disserving to the interests of any of the three codefendant declarants. In any case, while the statement may exculpate him of burglary it does not exonerate him of receiving stolen property.

## III

### No Instructional Error

■■■ Defendant requested a jury instruction based upon *People* v. *Azbill* (1933) 134 Cal.App. 616 [25 P.2d 1010]—"The mere possession of stolen property, unexplained by the person having possession, is not sufficient to justify a conviction of the crime of receiving stolen property," and one based on *People* v. *Myles* (1975) 50 Cal.App.3d 423 [123 Cal.Rptr. 348]—"Possession of stolen property is not shown by mere access or proximity to stolen goods; dominion and control must be shown." They were refused, but the trial court did incorporate a substantial portion of the *Azbill* instruction into CALJIC No. 14.65 by adding thereto, "Mere possession of stolen goods itself is not sufficient in itself to establish guilt." Asked by the court if, so modified, it was an acceptable substitute, defense counsel replied "I think that covers that [*Azbill*] instruction."

The trial court refused to give the two requested instructions on the ground they were adequately covered in CALJIC Nos. 14.65 and 1.24. ■■■ If they were, there was no error for the court is not required to give repetitious instructions. (*People* v. *Duckett* (1984) 162 Cal.App.3d 1115, 1127 [209 Cal.Rptr. 96].)

■■■ Given the modification of CALJIC 14.65 and defense counsel's concession it was an acceptable substitute, we deem to be without merit the contention that refusal to give the *Azbill* instruction was error. As to the *Myles* instruction, which would require the jury to find more than access or proximity, to wit, dominion and control, to convict defendant, CALJIC Nos. 14.65 and 1.24 required for conviction, the jury to find that he received or withheld stolen property, that he actually knew the property had been stolen when he received it, and that he had possession of the property, either actual (knowingly had direct physical control over it) or constructive (knowingly had the right of control over it directly or through another

person); it also instructed that "Mere possession of stolen goods itself is not sufficient in itself to establish guilt." Plainly, CALJIC Nos. 14.65 and 1.24 required the jury to make findings consistent with those demanded under defendant's requested instructions; and a comparison reflects that the instructions given covered the concepts stated in those refused.

In any case, no way is it reasonably probable that the jury would have reached a verdict more favorable to defendant had both requested instructions been given in addition to CALJIC Nos. 14.65 and 1.24, as urged by appellant. Appellant advances a factual argument based upon what he claims to be "the close nature of the contest in the evidence." We have examined the entire record and while we find minor discrepancies in the testimony of the shopkeepers who cooperated with one another to end the shoplifting spree, we fail to find any significant "contest" in the evidence, reject appellant's characterization of the case as a "close" one, and conclude that more than ample substantial evidence supports the finding that defendant knowingly possessed stolen property.

On August 5, within a brief period of time in the afternoon, three adult females dressed in baggy full skirts with large pockets, two of whom wore "booster girdles," stole clothing from at least four shops at El Rancho Center, then departed each time in a late model blue Cadillac in which an adult male was either passenger or driver; shortly thereafter, upon apprehension of the four in the blue Cadillac, in which defendant sat as a front seat passenger, the three women were identified by the shopkeepers as having been in their shops that afternoon and the clothing found on the rear seat of the vehicle between two of the women as having been stolen therefrom. Thomson's shop earlier that afternoon was entered by two of the women accompanied by defendant, who was identified by the store owner and her daughter; defendant conversed with Molly Thomson to divert her attention while the women roamed the shop but they were unable to steal anything because they were so closely watched by the owner; when they left, Molly Thomson saw defendant and the two women enter a blue Cadillac parked in front, and saw it being driven to farther down the parking lot. Troy Underwood, a hardware store owner, who had been alerted to the car and its occupants, saw the Cadillac, driven by an adult male, come from the direction of Thomson's shop and head into a parking place below The Sports Loft (from which merchandise was stolen); he walked past the car and went into a jewelry store to call police and while phoning, saw a female come down from The Sports Loft and enter the Cadillac and the car depart driven by the same man. Julie Olivari saw the three women in her shop; after they left, she discovered a jacket had been stolen; she looked out and saw them coming from Jackston's store; when the women saw her they quickly entered a blue Cadillac parked on the street—two women got in

back and one got in the front passenger side—and a fourth person drove it away. Subsequently, when defendant was arrested, he was a passenger in the blue Cadillac and was dressed in the same clothes identified by Molly Thomson as those he wore earlier in her store.

From the foregoing, two inferences are strong—during the afternoon of the shoplifting activities of the three women, defendant several times drove the Cadillac and other times was a passenger in the vehicle; and defendant was with the three women throughout the afternoon, either working with them or driving the car or waiting in the vehicle. Without question defendant had full knowledge of the nature of the activities of the three women and the source of the clothing piled in the back seat between the two women. Under these circumstances it is not unreasonable to conclude that defendant was fully aware of the mound of clothing on the back seat, how it got there and that it increased during the afternoon's activities. There is more than sufficient evidence to establish that defendant received the clothing with knowledge that it had been stolen. (*In re Richard T.* (1978) 79 Cal.App.3d 382, 388 [144 Cal.Rptr. 856]; *People* v. *Perez* (1974) 40 Cal.App.3d 795, 799 [115 Cal.Rptr. 405].)

## DISPOSITION

The judgment is affirmed.

Soven, J.,* concurred.

**JOHNSON, J.**—I respectfully dissent. For the reasons set forth below, I believe the trial court abused its discretion in denying Gatlin's motion to sever his trial from his codefendant, Sperling.

Trial courts should grant a motion to sever where there is a possibility that at a separate trial a codefendant would give exonerating testimony. (*People* v. *Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669]; *People* v. *Massie* (1967) 66 Cal.2d 899, 917 [59 Cal.Rptr. 733, 428 P.2d 869].) "When faced with a motion to sever on the ground that there is a possibility that at a separate trial there may be exonerating testimony by a codefendant, there are several areas of inquiry which, to some extent, overlap: (1) Does the movant desire the testimony of the codefendant; (2) will the testimony be exculpatory; (3) how significant is the testimony; (4) is the court satisfied that the testimony itself is bona fide; (5) on the basis of the showing at the time of the motion, how strong is the likelihood that, if the motion were granted, the codefendant will testify; and (6) what is the effect

---

* Assigned by the Chairperson of the Judicial Council.

of the granting in terms of judicial administration and economy?" (*People* v. *Isenor* (1971) 17 Cal.App.3d 324, 332 [94 Cal.Rptr. 746].)

Here, the motion to sever was supported by the offer of proof presented by Gatlin's attorney that, if Sperling's trial was severed, Gatlin would offer Sperling as a witness who would exculpate Gatlin. Gatlin's attorney expressly represented she spoke with Sperling's attorney who indicated Sperling's willingness to testify. Sperling's counsel did not contradict these statements. It is manifest the first two factors enunciated above are satisfied by this offer of proof.

The significance of Sperling's testimony is also undisputed. Since Gatlin was reluctant to testify on his own behalf because of the probability he would be impeached with his prior felony convictions, Sperling's exculpatory testimony would be crucial to Gatlin's defense.

As to the fourth factor, the trial court expressed doubt as to the bona fides of the proposed exculpatory testimony. However, there was no indication Sperling would be willing to perjure herself merely to assist Gatlin. Indeed, since Sperling was willing to testify on Gatlin's behalf after her trial but prior to the completion of any appeal she may prosecute, there was greater likelihood her testimony was trustworthy since she would be jeopardizing her own rights if she took the stand.

Further, although a trial court is free to reject bald assertions that someone would make an exonerating statement on the defendant's behalf (*People* v. *Isenor, supra*, 17 Cal.App.3d at p. 333), Gatlin was prepared to support his assertion that Sperling would make exculpatory statements with the transcript from the recently discovered tape recordings. However, since the trial court refused Gatlin the crucial time necessary to transcribe the tapes and use them in support of his motion, Gatlin should not now be penalized for his failure to provide such support. Moreover, Sperling's counsel did not contradict the representations by Gatlin's counsel that Sperling would in fact testify favorably to Gatlin, providing additional bona fides to these representations.

The majority contends there is no evidence Sperling would be likely to testify. This is incorrect. It was uncontradicted Sperling would in fact testify following the completion of her trial. Given the apparent assent by Sperling's counsel based upon his failure to indicate otherwise, the trial court's conclusion that it was speculative Sperling would testify is without basis.

Finally, judicial economy would not mandate the necessity of joint trials. The parties were prepared to proceed when Gatlin first moved for sever-

ance. Had the motion been granted, Sperling's trial could have commenced and, upon its completion, Gatlin's trial could have begun. Since Sperling was apparently willing to testify without awaiting any appellate disposition, any severance would not have greatly prolonged disposition of this matter.

In sum, all of the factors militate towards granting the motion to sever. The court's failure to grant the motion effectively prevented Gatlin from calling a crucial witness. Since there is a reasonable probability Gatlin would have obtained a more favorable result, I believe the judgment should be reversed.

A petition for a rehearing was denied April 21, 1989, and appellant's petition for review by the Supreme Court was denied June 28, 1989.